In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-3400, 98-4218, 99-3797

United States of America,

Plaintiff-Appellee,

v.

Dennis M. McGiffen/* and Wallace S.
Weicherding,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Illinois.
Nos. 98 CR 30035 & 98 CR 30053--Paul E. Riley, Judge.

Argued October 30, 2000--Decided September 21, 2001


   Before Ripple, Evans, and Diane P. Wood,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  Dennis
McGiffen and Wallace Weicherding were
members of a group of white supremacists
in southern Illinois. After a lengthy
undercover investigation by the FBI into
the group's activities, McGiffen,
Weicherding, and two co-conspirators,
Ralph Bock and Glenn Lowtharp, were
charged in a one-count indictment with
conspiracy to receive and possess
unregistered firearms and destructive
devices in violation of 18 U.S.C. sec.
371. McGiffen was also charged in a
separate one-count information with
possession of a machine gun in violation
of 18 U.S.C. sec. 922(o). He pleaded
guilty to both charges and received
concurrent sentences of 60 and 87 months;
his appeal is limited to sentencing
issues. Weicherding ultimately faced both
the conspiracy charge and the machine gun
charge under a two-count superseding
indictment. He went to trial, where the
jury convicted him on both counts; the
court sentenced him to concurrent 60- and
70-month sentences. Weicherding's appeal
attacks both his conviction and his
sentence. We affirm in McGiffen's case,
and we affirm Weicherding's conviction,
but we remand for further proceedings
directed to Weicherding's sentence.

I

The following account is drawn from the record in both cases, including Weicherding's jury trial; we view the facts in the light most favorable to the government. United States v. Wingate, 128 F.3d 1157, 1158 (7th Cir. 1997). In May of 1997, Vincent Reed contacted the FBI to report that some of his acquaintances, including McGiffen and Weicherding, were forming a new, potentially dangerous, white supremacist group in southern Illinois. According to Reed, the group hoped to pick up where "The Order" (a notoriously violent white supremacist organization active in the early 1980s) had left off, uniting white supremacist groups in a violent struggle against those who would resist the creation of a "pure white Christian country." This new group called itself, appropriately enough, the "New Order."

The FBI enlisted Reed as a paid informant charged with infiltrating the emerging New Order. Through Reed's surveillance, the FBI learned that McGiffen, already a Grand Dragon in the Illinois Ku Klux Klan (KKK), was the group's leader. McGiffen worked hard to build the new organization. He recruited and "naturalized" new members (a ritual that included swearing an oath and acquiring a distinctive tattoo) and regularly used both persuasion and force to maintain members' allegiance to the group. He organized and ran the meetings at which members made plans to acquire the money and weaponry they would need to pursue the New Order's militant racist agenda. Last, McGiffen parceled out tasks to the group's various members.

The New Order intended to raise money by robbing banks and armored cars. With those funds, it would then acquire a stockpile of firearms and explosives. The group was particularly interested in building a supply of fully-automatic weapons, which were valuable both for their destructive capabilities and as a source of revenue. McGiffen instructed Weicherding, a member of both the Aryan Nations and the KKK, to conduct surveillance on armored trucks and banks. Reed was assigned to get false identification for New Order members, and McGiffen gave himself and Bock the task of coordinating the acquisition of

weapons and explosives.

Weicherding did as he was told. He cased banks and discussed with Reed the specifics of carrying out the first robbery. He also joined McGiffen in the weapons acquisition effort. By June 20, 1997, they had purchased a TEC-9 pistol and gunpowder for use in homemade grenades. On August 28, 1997, Weicherding, Reed, and McGiffen drove together to the home of Ralph Bock to acquire additional firearms. While in the car, they discussed the fact that they were now in possession of a LAWS Rocket (supplied by Reed after it was disabled by the FBI) and dynamite. During thatconversation they also discussed their plans to convert semi-automatic weapons into fully-automatic weapons with the help of Glen Lowtharp, a white supremacist ally with expertise in such things.

On November 8, 1997, Weicherding and McGiffen went to visit Lowtharp, bringing with them two weapons they wanted to convert from semi- to fully-automatic. The three men then proceeded to Lowtharp's sister's house to pick up the parts they needed to complete the conversions and then to his nephew's place to get an AR-15 assault rifle. The next morning, McGiffen and Lowtharp converted the AR-15 rifle to a fully-automatic weapon, using a machine gun hammer, a machine gun trigger, a machine gun disconnector, and a machine gun selector. Weicherding, who had received weapons training during a stint as a prison guard for the Illinois Department of Corrections, watched as the others worked. In tests later conducted by a government expert, the AR-15 fired multiple rounds from its clip with a single pull of the trigger.

With the converted AR-15 in hand, McGiffen and Weicherding left Lowtharp's house with the other two guns they had brought along; they told Lowtharp they planned to use the AR-15 as a model for converting other firearms to "full auto." They also left with "how to" literature about weapons conversion, which specifically warned that "the mere possession of a part or parts which convert a weapon to full auto is illegal without prior [Federal Bureau of Alcohol, Tobacco, and Firearms, or BATF]

approval." Later, Weicherding again approached Lowtharp to see if he had acquired any additional machine gun parts the group could use for further conversions.

As the New Order's weapons acquisition activities progressed, its ambitions grew. Members discussed possible assaults on Morris Dees and the Southern Poverty Law Center, Federal Reserve Chairman Alan Greenspan, and a host of other targets. They discussed expanding their organization nationwide and disabling the country's communications infrastructure. At the same time, the growing stockpile of weapons increased McGiffen's concern that law enforcement authorities might get wind of the group's activities. At a meeting at his house, group members, including Weicherding and Reed, were strip-searched for wires, and McGiffen proposed that future telephone conversations be conducted in code--the word "bibles," for example, became code for automatic weapons. Anxiety grew to the point that when McGiffen learned that New Order member Jeff Schmitz told his mother about the group's plans, he stuck a gun to Schmitz's stomach and threatened to kill him and his children if he opened his mouth again.

During January and February of 1998, McGiffen, Weicherding, and other members of the New Order began in earnest to plan their first violent act: the destruction of Morris Dees and the Southern Poverty Law Center. Weicherding took a trip to Atlanta to assess the vulnerability of the center itself and, more ominously, five days after discussing the possibility of assassinating Dees, he took a revolver and drove an hour to attend a speech by Dees at Southern Illinois University in Evansville. According to government agents on the scene, Weicherding entered the hall, got in line, but then left after noticing that all guests were required to pass through a metal detector. Weicherding claimed at trial that he left the weapon in his car.

On February 23, 1998, the FBI obtained search warrants for five sites, including Weicherding's residence. That search produced substantial evidence of Weicherding's association with both the Aryan Nations and the KKK, as well as a

TEC-9 and a MAC-11 semi-automatic revolver. The FBI also found and seized $12,238 in cash.

A search of Bock's house yielded a gas grenade launcher, a semi-automatic rifle, literature on converting the rifle to fully-automatic, and all the necessary components for a pipe bomb. The search of McGiffen's house yielded similar evidence. He had literature illustrating the weapons conversion process and a brochure advertising various parts needed to convert AR-15s to fully-automatic rifles. That brochure specifically warned "to get the ATF's approval before concluding your conversion." The agents also caughtMcGiffen himself with the gun that Weicherding took to the Dees lecture and an illegal Street Sweeper 12-gauge shotgun. The FBI's search of McGiffen's mother's home turned up another TEC-9, a pipe bomb, five steel hand grenade hulls, a tear gas grenade, the original converted AR-15 rifle, the LAWS Rocket, and a sawed-off bolt action shotgun. After the searches, both Weicherding and McGiffen were arrested, along with Bock and Lowtharp.

After initially pleading not guilty, McGiffen entered into a written plea agreement with the government and changed his plea to guilty. The court concluded that his offense level was a 26, which included a four-level enhancement for use or possession of a weapon in connection with another felony, U.S.S.G. sec. 2K2.1(b)(5), and another four-level enhancement under sec. 3B1.1(a) for being a leader or organizer of the weapons conspiracy. McGiffen appeals these two enhancements.

Weicherding chose to go to trial. Before trial, the government persuaded the district court to require that the $12,238 seized from Weicherding's home be put toward his defense. Once at trial, Weicherding sought to paint the government's evidence as proving only that a small group of white supremacists spent the better part of 1997 and early 1998 drunk and bragging about all the things they were going to do on behalf of the white race. Weicherding denied knowing that the AR-15 machine gun was converted, attributing his ignorance to having been drunk or absent on all relevant occasions. The jury rejected the

inebriation and uninvolvement stories and convicted him on both counts. On appeal, he argues that there was not enough evidence to convict him of knowingly possessing an illegal machine gun. He also argues that the district court had no basis for requiring the $12,238 to be devoted to his defense, and that the court erred when it enhanced his sentencing offense level for obstruction of justice, under U.S.S.G. sec. 3C1.1.

We will take the defendants and their claims in turn.

II

A.  McGiffen

1.  The sec. 2K2.1(b)(5) Enhancement

Over McGiffen's objection, the district court increased his sentence by four levels after concluding that he "used or possessed a[ ] firearm . . . in connection with another felony offense; or possessed . . . a[ ] firearm . . . with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. sec. 2K2.1(b)(5). The court adopted the presentence report's factual finding that members of the conspiracy intended to use the converted AR-15 rifle as a prototype to convert other weapons and to sell converted weapons to other groups and that the AR-15 was part of a stockpile intended for use in "planned acts of violence which included felony offenses."

McGiffen does not dispute the district court's interpretation of the sentencing guidelines. Instead, he objects to the court's factual conclusions. He has chosen a difficult path. We will not disturb the district court's factual determinations at sentencing unless they are clearly erroneous. United States v. Craig, 178 F.3d 891, 900 (7th Cir. 1999). As evidence of clear error, McGiffen points to the district court's conclusion that the government did not prove that the New Order was an "iron clad" organization "bent upon destruction of black citizens" or that "steps were taken to implement [ ] hits" against targets like the Southern Poverty Law Center. McGiffen believes that this conclusion is inconsistent with the factual findings in

the presentence report and that adopting the presentence report's recommendation was thus clearly erroneous.

Before we could even consider McGiffen's argument, however, we would have to conclude that the presentence report contains the kind of flat contradiction he describes. If it did, then we would have to decide how much more of the report the alleged contradiction tainted. But the latter inquiry is not necessary here because we find that the two findings McGiffen identifies are not mutually exclusive. The presentence report concluded only that McGiffen possessed the converted AR-15 and other weapons with the intent to use them in connection with other "planned . . . felony offenses." It did not go on to identify an exclusive list of what the district court called "specific hits against enemy targets," and thus the district court's conclusion that the New Order did not attempt to carry out such hits does not create any tension with the rest of the report. Furthermore, there is a difference between having an intent to use weapons to commit other planned felonies and carrying out the specific planning and implementation process. (We note that the government concedes that it would have been error to enhance McGiffen's sentence under sec. 2K2.1(b)(5) if the only other felonies relied on by the district court were the weapons possession and trafficking offenses mentioned in the presentence report, see sec. 2K2.1 comment 18, but as we now explain, the court had different felonies in mind.)

There is ample evidence, for example, that McGiffen and his co-conspirators planned to use their weapons to rob banks. Whether their ultimate goal was to fund a race war with the proceeds (and in the course of doing so to commit yet other felonies) is beside the point: bank robbery is obviously a felony offense. The district court recognized this when it rejected McGiffen's objection at sentencing that Weicherding "never planned any bank robberies and at most drove by a bank . . . and mentioned it would be easy to rob." The district court was not prepared to find that the New Order was planning a race war, but it did conclude that there was sufficient evidence that the group of co-

conspirators planned to rob banks, and that conclusion was not clearly erroneous. Similarly, the district court concluded that the government proved by a preponderance of the evidence that McGiffen threatened an unindicted co-conspirator, Jeffrey Schmitz, by placing a weapon to his stomach and threatening to kill him. Like the plan to rob banks, this assault was sufficient to provide a factual basis for a sec. 2K2.1(b)(5) enhancement.

We are therefore satisfied that the district court did not clearly err when it concluded that the factual basis existed for the enhancement for McGiffen's possessing a firearm in connection with another actual or intended felony.

## 2. Organizer or Leader Enhancement

The sentencing guidelines call for a four-level enhancement if the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. sec. 3B1.1. The district court applied this enhancement to McGiffen's sentence after explaining that while there did not appear to be an "iron clad New Order . . . there was a group of people" (fifteen of whom the judge named) involved in the conspiracy to acquire illegal weapons, some of whom he acknowledged were more involved than others. With respect to McGiffen's level of involvement, the court adopted the presentence report's finding that McGiffen "recruited members and associates, assigned tasks to the group members, planned and organized the acquisition and storage of weapons, . . . scheduled all meetings and exercised control and authority over other members of the group."

McGiffen again challenges the district court's factual conclusions as clearly erroneous. He believes the court applied the enhancement on the basis of McGiffen's role in the alleged New Order plot to start a race war, in spite of the fact that it found that the government had failed to prove the existence of an "iron clad New Order." He contends that when the factors to be considered in applying the leader/ organizer enhancement, including exercise of decisionmaking authority, recruitment of

accomplices, and degree of planning or organizing the offense, are considered in relation to the crimes proven--the conspiracy to acquire and possess illegal weapons--it is evident that "McGiffen was a member and nothing more."

The record belies McGiffen's effort to downplay his role. First, it is quite clear that the district court applied the sec. 3B1.1 enhancement on the basis of McGiffen's role in the conspiracy to acquire illegal weapons and to use the group's arsenal to raise money and to facilitate other criminal activity. As before, the district court's finding that the group did not also attempt to carry out actual attacks on "enemy targets" is of no particular relevance. There is ample evidence in the record to support the conclusion that McGiffen was the central figure in this conspiracy. He recruited and inducted members into the group that conspired to acquire the weapons; he organized and ran the meetings at which the plans for acquiring the weapons were hatched; and he directed the members' activities with respect to acquiring and disposing of the weapons. McGiffen also took responsibility for enforcing allegiance to the conspiracy, going so far as to threaten to kill persons who leaked information about the group's criminal activity. The district court's finding that McGiffen was a leader of the conspiracy, and its consequent decision to apply the sec. 3B1.1 enhancement, were not clearly erroneous.

B.  Weicherding

1.  Monetary Contribution Toward Defense

Following his arrest, Weicherding completed a financial affidavit in which he listed his assets as $30,500, including $22,000 in cash and two cars valued together at $8,500. He reported a monthly social security check of $738, the bulk of which ($700 per month) went toward credit card debts totaling $20,000. Relying on this report, a magistrate judge found Weicherding unable to pay for his own defense and appointed counsel from the Federal Public Defender (FPD).

Several weeks later, the government filed a motion with the district court under 18 U.S.C. sec. 3006A(f), requesting

that the $12,238 seized during the search of Weicherding's home (apparently part of the $22,000 in cash he listed in his affidavit) be given to the FPD to help fund his defense. The government reasoned that this case would be unusually costly for the FPD and asserted, without explanation, that Weicherding was financially able to make the contribution. Weicherding (through his FPD counsel) responded that requiring him to contribute the funds would impose a substantial hardship given his debts and the fact that if incarcerated he would no longer receive social security benefits.

Without holding an evidentiary hearing, the district court issued a brief order granting the government's motion. The order offered no explanation for the decision other than that it was "reasonable" to require the contribution under sec. 3006A(f). Weicherding contends that this decision was an abuse of discretion. See United States v. Hoover, 175 F.3d 564, 569 (7th Cir. 1999) (requiring contribution is within the discretion of the district court). We agree.

Section 3006A(f) provides in relevant part:

Whenever the United States magistrate or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney . . . or community defender organization which provided the appointed attorney. . . .

We construed this statutory provision in United States v. Gurtunca, 836 F.2d 283, 288 (7th Cir. 1987). Gurtunca rejected the government's argument that a district court could require the defendant to contribute funds under sec. 3006A(f) without a hearing, or without making appropriate findings that the funds were "available" within the meaning of the statute. More recently, United States v. Embry, 128 F.3d 584 (7th Cir. 1997), clarified that a formal evidentiary hearing may not always be necessary, but Embry did not disturb Gurtunca's requirement that a district court make appropriate findings of availability. To the contrary, it indicated the kind of findings that are necessary, such as

whether requiring the contribution would impose an extreme hardship on the defendant, whether it would interfere with his obligations to his family, and whether there were third parties with valid claims to the funds. In Embry itself, the district court's order revealed that it had considered each of these factors and found, within its discretion, that Embry's funds were "available." This, we found, was enough. Id. at 586. Our sister circuits similarly require that there be evidence that the district court made specific inquiries into the defendant's financial circumstances and obligations. See Museitef v. United States, 131 F.3d 714, 716 (8th Cir. 1997) (court must inquire into personal family needs and liquidity of finances); United States v. Fraza, 106 F.3d 1050, 1056 (1st Cir. 1997) (remanding for hearing or findings as to defendant's financial ability).

The district court in this case neither held an evidentiary hearing nor made findings along the lines suggested by Embry. There is nothing in the record to confirm that the court understood the factors it needed to consider, or applied those factors to the evidence before it. Under the circumstances, we are unable to determine how, if at all, the district court exercised its discretion in choosing to require Weicherding to contribute the $12,238 to his defense. This issue must therefore be remanded to the district court for further consideration.

2. Possession of a Machine Gun

Count 2 of the superseding indictment against Weicherding charged him with illegal possession of a machine gun in violation of 18 U.S.C. sec. 922(o)(1). Weicherding contends the government presented insufficient evidence at trial to support the conviction. When considering a challenge on direct appeal to the sufficiency of the evidence to sustain a conviction, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

We begin with the language of sec. 922(o)(1), which provides as follows:

(1)  Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machine gun.

(2)  This subsection does not apply with respect to--

(A)  a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B)  any lawful transfer or lawful possession of a machine gun that was lawfully possessed before the date this subsection takes effect.

For purposes of this statute, a machine gun is defined broadly as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. sec. 5845(b). The term also includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled." Id.

One element that the government must prove in order to obtain a conviction under sec. 922(o)(1) is the defendant's knowledge: specifically, the government must show that the defendant knew that the weapon had the characteristics that bring it within the statutory definition of a machine gun. See United States v. Ross, 40 F.3d 144, 146 (7th Cir. 1994) (defining the mens rea for earlier statutory version of sec. 922(o)); 18 U.S.C. sec. 924(a)(2) (requiring "knowing" violation of section 922(o)). This is the point at which Weicherding asserts the government's proof failed.

Weicherding argues that no reasonable jury could have concluded that he knowingly possessed a machine gun when he and McGiffen took possession of the converted AR-15 assault rifle from Lowtharp. He points to testimony at trial

that a layperson looking at the modified AR-15 would not necessarily know it was a fully-automatic weapon, and he claims that Lowtharp testified at trial that, following the conversion, he thought the gun would fire only in semi-automatic mode.

But the jury did not need to find that a random layperson knew that the AR-15 was a machine gun; it was asked whether Weicherding knew. As to that question, the record easily supports the jury's affirmative conclusion. The government presented evidence at trial that Weicherding and McGiffen repeatedly discussed converting weapons to fully-automatic; that Weicherding accompanied Lowtharp and McGiffen to pick up the AR-15; that Weicherding watched as Lowtharp and McGiffen added machine gun parts to the weapon; and that Weicherding and McGiffen left Lowtharp's residence with the converted AR-15 and literature on converting other weapons to fully-automatic. This was more than enough to permit the jury to conclude that Weicherding knew the AR-15 had been redesigned to function as a machine gun.

With respect to Lowtharp's testimony, it is true that he said that at the time he gave Weicherding and McGiffen the converted AR-15 he believed that an additional spring was necessary to make the machine gun operable. (He later realized that he was wrong; consistent with the government's expert testimony at trial that the weapon was fully-automatic, the absence of the spring merely meant that once the trigger was pulled, the magazine would empty even if the shooter released the trigger.) Even assuming that the jury believed Lowtharp on this point and that it further believed that Lowtharp shared this erroneous view with Weicherding, the fact that Weicherding may have thought that an additional spring was necessary to make the AR-15 operational as a machine gun does not preclude conviction under sec. 922(o). There was sufficient evidence that Weicherding knew that the modified AR-15 contained "a combination of parts designed and intended, for use in converting a weapon into a machine gun" and that the modified AR-15, even if not fully operational, was now "designed to shoot" in fully-automatic mode and could readily be adjusted to do so. Given the

broad statutory definition of machine gun, there was sufficient evidence to convict Weicherding under sec. 922(o). See United States v. Pena-Lora, 225 F.3d 17, 33 (1st Cir. 2000) (inoperable machine gun sufficient to support conviction); United States v. Buggs, 904 F.2d 1070, 1075 (7th Cir. 1990) (conviction upheld because inoperable weapon was "designed to shoot" as required by 18 U.S.C. sec. 921(a)(3)); United States v. Syverson, 90 F.3d 227, 230-31 (7th Cir. 1996) (upholding conviction for possession of parts designed to modify semi-automatic weapon to machine gun); United States v. York, 830 F.2d 885 (8th Cir. 1987) (gun that was inoperable because it lacked firing pin was still "designed to expel a projectile" and thus satisfied definition of firearm).

3. Obstruction of Justice Enhancement

The district court increased Weicherding's offense level two notches up for obstruction of justice under U.S.S.G. sec. 3C1.1. In doing so, it adopted the recommendation of the presentence report and added, without further explanation, "I thought your testimony was riddled with inaccuracies and lies." Weicherding argues that this was inconsistent with the Supreme Court's decision in United States v. Dunnigan, 507 U.S. 87 (1993), which requires specific findings to support a perjury enhancement.

A sentencing court may enhance a defendant's offense level under sec. 3C1.1 "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." Perjury can be the basis for a sec. 3C1.1 increase, but not every instance of false testimony under oath warrants the enhancement. See Dunnigan, 507 U.S. at 94-95; U.S.S.G. sec. 3C1.1 application note 2. In order to ensure that the obstruction of justice enhancement does not become a punishment for any defendant who chooses to exercise his right to testify, the district court "must review the evidence and make independent findings necessary to establish a willful impediment to, or

obstruction of, justice, or an attempt to do the same." Dunnigan, 507 U.S. at 95. Among the findings required are that the defendant's misrepresentation was willful, material to the investigation or prosecution of the instant offense, and made with the specific intent to obstruct justice rather than as a result of confusion, mistake or faulty memory. Id. at 94; see also United States v. Ewing, 129 F.3d 430, 434 (7th Cir. 1997); United States v. Agostino, 132 F.3d 1183, 1198 (7th Cir. 1997).

Our review of the adequacy of the district court's conclusions under Dunnigan is de novo, and any factual findings are reviewed for clear error. United States v. Gage, 183 F.3d 711, 715 (7th Cir. 1999). Although Dunnigan does not impose an inflexible requirement that the sentencing court document its reasoning on each element of the alleged perjury, see United States v. Craig, 178 F.3d 891, 901 (7th Cir. 1999), the district court's findings must "encompass[ ] all of the factual predicates for a finding of perjury." Id., quoting Dunnigan, 507 U.S. at 95. The inadequacy of the district court's findings in this case are illustrated well by a comparison to our holding in Gage. There the court imposed a perjury enhancement after identifying a specific statement by the defendant that it concluded was a lie; the court was persuaded that Gage deliberately misrepresented the truth when he claimed he could not remember the contents of a note he had written because he was high on drugs. Despite the court's very specific identification of the statement it considered to be a lie, we reversed on the ground that the court had not made a finding that Gage told the lie with the specific intent to obstruct justice. 183 F.3d at 716-17.

This is, if anything, an even clearer instance than Gage was of a case where Dunnigan requires a remand. The district court never identified which of Weicherding's statements it considered to be lies and why. The record also contains not a hint of the court's reasoning on the critical issues of materiality or specific intent to obstruct justice. This does not comply with Dunnigan's command to conduct "a review of the evidence and [to make] independent findings," and it

precludes us from "discharg[ing] our appellate responsibility to determine whether the court's findings are clearly erroneous," United States v. Ledezma, 26 F.3d 636, 645 (6th Cir. 1994). We thus must vacate Weicherding's sentence so that the district court may reconsider whether the obstruction of justice enhancement is called for on this record and so that it can make the necessary findings to support its conclusion.

III

To recap, we AFFIRM McGiffen's sentence and Weicherding's conviction. We VACATE and REMAND Weicherding's sentence for further proceedings consistent with this opinion, as well as the district court's decision to require Weicherding to contribute $12,238 to his own defense.

FOOTNOTE

/* In No. 99-3797, Dennis McGiffen's name is spelled "McGiffin." Because it appears as "McGiffen" in the other two cases (Nos. 98-3400 and 98-4218) and throughout his brief and the record, we have used the latter spelling.