In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2294

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID OLOFSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06 CR 320—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED JANUARY 22, 2009—DECIDED MAY 1, 2009

Before MANION and KANNE, *Circuit Judges*, and
KENDALL, *District Judge.*[*]

MANION, *Circuit Judge.* David Olofson was indicted for
knowingly transferring a machinegun in violation of 18
U.S.C. § 922(*o*). A jury convicted Olofson of the charged
offense following a two-day trial, and the district court

_____

[*] Hon. Virginia M. Kendall, District Judge for the Northern
District of Illinois, is sitting by designation.

sentenced him to thirty months' imprisonment. Olofson appeals his conviction. For the following reasons, we affirm.

## I. Background

Robert Kiernicki saw a "for sale" advertisement for a Colt AR-15 rifle that David Olofson had posted at a gas station in New Berlin, Wisconsin. Kiernicki called Olofson at the phone number listed on the ad to inquire about the weapon. Olofson informed Kiernicki that the advertised gun was no longer available but agreed to order and assemble another Colt AR-15 for Kiernicki. In the meantime, Olofson loaned Kiernicki an AR-15[1] and hundreds of rounds of ammunition on four separate occasions. The selector switch on the borrowed AR-15 had three positions: one marked "fire," one marked "safety," and one that was unmarked. Olofson and Kiernicki discussed the unmarked setting on July 13, 2006, which was the fourth time that Olofson loaned Kiernicki the weapon. Olofson told Kiernicki that putting the selector switch in the unmarked position would enable the AR-15 to fire a three-round burst with a single pull of the trigger, but the gun would then jam.

While at a shooting range that same day, Kiernicki (for the first time since using the gun) switched the AR-15 to

---

[1] Four of the AR-15's fire control components were parts from M-16 rifles: the trigger, hammer, disconnector, and selector switch.

the unmarked position and pulled the trigger; three or four rounds were discharged before the gun jammed. Kiernicki fired the weapon in that fashion several times, and each time it jammed after a short burst of three or four rounds. Police received a telephone complaint of automatic gunfire at the shooting range. When officers arrived at the range, they confiscated the AR-15 from Kiernicki. Kiernicki told the police that he had borrowed the gun from Olofson. Several days later, agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") interviewed Olofson while executing a search warrant at his home. During that conversation, Olofson acknowledged loaning the AR-15 to Kiernicki.

On December 5, 2006, a grand jury indicted Olofson for knowingly transferring a machinegun in violation of 18 U.S.C. § 922(*o*). Shortly before trial, Olofson filed a motion to compel the government to disclose evidence of the ATF's firearms testing procedures, correspondence between the ATF and the manufacturer of Olofson's AR-15 about the use of M-16 parts in AR-15 rifles, and the ATF's registration history of AR-15 rifles that contain M-16 parts. The district court denied that motion on the first day of trial after concluding that the information the defendant was seeking was not exculpatory under *Brady v. Maryland*, 373 U.S. 83 (1963).

At trial, the government asked the district court to exclude Olofson's expert witness from the courtroom during the testimony of its firearms expert. Over Olofson's objection, the court granted the government's request. The government's expert testified that he used military-

grade ammunition the first time he test-fired the AR-15 with the selector switch in the unmarked position and that the gun fired only one round. Later, using civilian-grade ammunition, he conducted two more test-fires of the weapon in the unmarked mode. In one of those tests, he held the trigger down and the gun fired all of its ammunition (twenty rounds) before stopping. He also emptied two twenty-round magazines in five- or ten-round bursts by depressing, holding, and releasing the trigger several times. The government's expert stated that such firing capabilities did not result from a "hammer-follow" malfunction but rather were intended features of the gun.

After the close of the evidence, the court used the definition of a "machinegun" from 26 U.S.C. § 5845(b) to instruct the jury and chose not to define the word "automatically" from that statute as the defendant had requested. Following deliberation, the jury returned a guilty verdict. Olofson then moved for a judgment of acquittal, arguing that the evidence presented at trial was insufficient to convict him of the charged offense and that the statutes under which he was prosecuted are unconstitutionally vague. The district court denied that motion and sentenced Olofson to thirty months in prison. Olofson appeals, challenging his conviction on five grounds.

## II. Discussion

### A. Olofson's Proposed Jury Instruction

Title 18 U.S.C. § 922(*o*)(1) provides that, subject to exceptions not relevant here, "it shall be unlawful for

any person to transfer or possess a machinegun." The applicable definition[2] of a "machinegun" is

> *any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.* The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added). The district court instructed the jury using the first sentence of § 5845(b) but did not give any guidance on the meaning of the word "automatically." Olofson contends that the court inaccurately stated the law when it did not instruct the jury using the definition of "automatically" that derives from *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994), and that we allegedly adopted in *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002).[3] Whether jury

---

[2] According to 18 U.S.C. § 921(a)(23), "[a]s used in this chapter[,] [t]he term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. [§] 5845(b))."

[3] The defendant contends that if that instruction had been given, the jury could have found him not guilty because a

(continued...)

instructions correctly state the law is a matter we review de novo. *United States v. Thornton*, 539 F.3d 741, 745 (7th Cir. 2008). We will reverse only if the instructions viewed as a whole misled the jury to the defendant's prejudice. *Id.*

In *Staples*, the defendant was convicted of possession of an unregistered machinegun. 511 U.S. at 603-04. At trial, the defendant insisted that he did not know that the weapon was capable of firing automatically (which is one of the features of a "machinegun" under § 5845(b)) and requested a jury instruction that the government must prove beyond a reasonable doubt that he knew the gun could fire in such a manner. *Id.* The district court refused to give the defendant's proposed instruction; instead, it gave an instruction that discounted the defendant's need for knowledge of every characteristic of the weapon that made it subject to regulation. *Id.* at 604. The Tenth Circuit affirmed, holding that "the Government need not prove a defendant's knowledge of a weapon's physical properties to obtain a conviction." *Id.* In reversing, the Supreme Court held that the government was required to prove that the defendant knew of the characteristics of the gun that brought it within the ambit of the statute. *Id.* at 619.

At the beginning of its opinion, the Court quoted the statutory definition of "machinegun" from § 5845(b) and

---

[3] (...continued)

malfunction was the reason the weapon stopped firing or, alternatively, was what caused the gun to fire more than one round with a single trigger pull.

stated that "any fully automatic weapon is a 'firearm' within the meaning of the Act." *Id.* at 602. In a footnote, the Court then said the following:

> As used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. *That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted.* Such weapons are "machineguns" within the meaning of the Act.

*Id.* at n.1 (emphasis added).

The narrow holding from *Staples* is that *mens rea* was an element of the crime in question—i.e., that the government had to prove the defendant's knowledge of the features of the weapon (including automatic firing capability) that brought it within the proscriptive purview of the statute. *Id.* at 619. The precise definition of "automatically" was not at issue; therefore, the Court's discussion of the terms "automatic" and "fully automatic" was immaterial to its holding. Indeed, the Court prefaced its explanation of the terms "automatic" and "fully automatic" with the phrase "[a]s used here." Thus, rather than interpreting a statute, the Court simply was providing a glossary for terms frequently appearing in the opinion. Therefore, *Staples* did not establish a requirement for district courts to instruct juries on the meaning of "automatically" from § 5845(b).

The same is true of our decision in *Fleischli*. In that case, the defendant was convicted of two counts of possession

of machineguns in violation of 18 U.S.C. § 922(*o*)(1). *Fleischli*, 305 F.3d at 647. The defendant argued that a certain weapon was not a machinegun under § 5845(b) because it did not fire automatically and did not have a trigger. *Id.* at 654. Fleischli relied upon the definition of a semiautomatic rifle from 18 U.S.C. § 921(a)(28) to assert that a gun does not fire automatically "unless it uses a portion of the energy of a firing cartridge to extract the fired cartridge and chamber the next round without a separate pull of the trigger." *Id.* at 655. This court concluded that the gun's electronic on/off switch that initiated the firing sequence was a trigger and, having quoted from footnote one in *Staples*, stated that if the gun continued to fire until that switch was turned off or until the ammunition was exhausted, it was a machinegun. *Id.* at 655-56.

Olofson suggests that *Fleischli* obliged the district court to give his proffered instruction. True, in *Fleischli* we did borrow terminology from *Staples* in order to stamp out the appellant's "disingenuous argument"; *id.* at 655; however, we never purported to be setting forth a comprehensive definition of "automatically" from § 5845(b). Indeed, we described the *Staples* footnote as merely "offer[ing] commonsense explanations" of the words "automatic" and "semiautomatic," which confirms that we did not consider that passage to be precedentially binding. As we explain below, a weapon does not have to continue to fire until its trigger is released or its ammunition is exhausted in order to qualify as a "machinegun" under § 5845(b). Therefore, Olofson's reliance on *Fleischli* for that proposition is misplaced.

We turn now to address what the word "automatically" means as it is used in the definition of "machinegun" in § 5845(b). "Statutory interpretation begins with the plain language of the statute." *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). We assume that the purpose of the statute is communicated by the ordinary meaning of the words Congress used; therefore, absent any clear indication of a contrary purpose, the plain language is conclusive. *Id.*

Again, "[t]he term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). "The most relevant time for determining a statutory term's meaning" is the year of the provision's enactment. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994) (citing *Perrin v. United States*, 444 U.S. 37, 42-45 (1979)). Therefore, we examine how "automatically" was commonly used and understood in 1934, the year in which the definition of "machinegun" became law with the passage of the National Firearms Act, Pub. L. 73-474, 48 Stat. 1236. A leading dictionary from 1934 tells us that "automatically" is the adverbial form of "automatic." WEBSTER'S NEW INTERNATIONAL DICTIONARY 187 (2d ed. 1934). The adjectival form of "automatic" is relevantly defined by that dictionary as "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]" *Id.* Another contemporaneous dictionary similarly describes "automatic" as "[s]elf-acting under conditions fixed for it, going

of itself." OXFORD ENGLISH DICTIONARY 574 (1933).[4] Thus defined, in § 5845(b) the adverb "automatically," as it modifies the verb "shoots,"[5] delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism. That mechanism is one that is set in motion by a single function of the trigger and is accomplished without manual reloading.

That interpretation clearly forecloses the argument that a weapon is not a machinegun merely because it *stopped firing* due to a malfunction; indeed, the reason a weapon ceased firing is not a matter with which § 5845(b) is concerned. Under that interpretation, however, a defendant can still argue that the *reason a gun fired more than one round* (with a single pull of the trigger without manual reloading) was due to a malfunction—i.e., the additional rounds fired resulted from a mishap rather than from a regular self-acting mechanism.

In light of the foregoing interpretation, we conclude that Olofson's proffered instruction was not an accurate statement of the law and that the district court properly rejected it. Moreover, the district court correctly used § 5845(b) to instruct the jury. As used in the statute,

---

[4] Modern versions of those two dictionaries define "automatic" in the same terms. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 148 (2002); OXFORD ENGLISH DICTIONARY 805 (2d ed. 1989).

[5] For the sake of efficiency and readability, we use the term "shoots" as shorthand for "shoots, is designed to shoot, or can be readily restored to shoot," unless otherwise indicated.

"automatically" comports with its ordinary modern meaning, *see* note 4, that is readily accessible to laypersons and is in no sense confusing; therefore, the district court was not required to define that term for the jury. *United States v. Castillo*, 406 F.3d 806, 821 (7th Cir. 2005); *Miller v. Neathery*, 52 F.3d 634, 638 (7th Cir. 1995).

### B. Sufficiency of the Evidence

Olofson contends that the evidence presented at trial was insufficient to sustain his conviction. When a defendant challenges the sufficiency of the evidence, we view the evidence in the light most favorable to the government and will reverse the conviction only if no rational jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Castaldi*, 547 F.3d 699, 705 (7th Cir. 2008). In order to convict a person of violating 18 U.S.C. § 922(*o*)(1), the government must prove that 1) the defendant possessed or transferred a machinegun 2) with knowledge that the weapon had the characteristics that bring it within the statutory definition of a machinegun. *United States v. McGiffen*, 267 F.3d 581, 590 (7th Cir. 2001).

Regarding the first element, Kiernicki testified that Olofson loaned him the AR-15 on four occasions, the last of which was July 13, 2006. An ATF agent also testified that Olofson admitted loaning the gun to Kiernicki. In addition, Kiernicki stated that the gun fired three or four rounds (on several occasions) with one pull of the trigger. The government's expert who test-fired the AR-

15 stated that he exhausted a twenty-round magazine with one continuous depression of the trigger and emptied two additional twenty-round magazines in five- or ten-round bursts by intermittently depressing, holding, and releasing the trigger. He also declared that the weapon was intended to fire in such fashions and that a "hammer-follow" malfunction was not the cause. That evidence was adequate to permit a reasonable jury to find beyond a reasonable doubt that Olofson transferred a "machinegun" as defined by § 5845(b). Regarding the evidence on the knowledge element, Kiernicki said that Olofson told him "the three-round burst wouldn't work and that it would jam up." Kiernicki understood that statement to mean that "[t]hree rounds come out of it when you would pull the trigger" once. That testimony was sufficient for a reasonable jury to find beyond a reasonable doubt that the defendant knew that the AR-15, with a single pull of the trigger and without manual reloading, could shoot more than one round as the result of a self-acting mechanism. For these reasons, the defendant's challenge to the sufficiency of the evidence fails.[6]

## C.  *Unconstitutional Vagueness*

Olofson argues that 18 U.S.C. §§ 922(*o*) and 924(a)(2) are unconstitutionally vague. We review the constitutionality

---

[6] The jury heard the testimony of the defendant's firearms expert about the AR-15's supposed malfunctioning and obviously rejected it; on a sufficiency-of-the-evidence challenge, we will not second-guess the jury's credibility determinations. *United States v. Brandt*, 546 F.3d 912, 917 (7th Cir. 2008).

of a statute de novo. *United States v. Warner*, 498 F.3d 666, 697 (7th Cir. 2007). A statute is unconstitutionally vague if it either "1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or 2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *United States v. Lim*, 444 F.3d 910, 915 (7th Cir. 2006). A vagueness challenge such as this one that does not implicate First Amendment freedoms is analyzed as applied to the specific facts of the case. *Id.*

To the extent Olofson contends that the statutes are fatally vague due to the way "automatically" is used in the incorporated definition of "machinegun" from § 5845(b), we disagree. We have already noted that the common meaning of "automatically" is readily known by lay-persons and thus a specific instruction defining the term for the jury was unnecessary. Similarly, a person of ordinary intelligence would have understood the common meaning of the term—"as the result of a self-acting mechanism"—and thus would have had fair warning of the relevant features of a weapon that § 5845(b) covers and that §§ 922(*o*) and 924(a)(2) regulate. Therefore, we reject Olofson's argument that §§ 922(*o*) and 924(a)(2) are unconstitutionally vague.[7]

---

[7] Olofson does not present any cogent argument that §§ 922(*o*) and 924(a)(2) lack standards to prevent arbitrary or discriminatory enforcement.

*D.   Exclusion of Olofson's Firearms Expert from the Court-*
     *room*

The defendant also argues that the district court improp-
erly granted the government's request to exclude his
firearms expert (Len Savage) from the courtroom during
the testimony of the government's firearms expert. Olofson
contends that the presence of his expert during the testi-
mony of the government's expert was essential to the
presentation of his case.

Under Federal Rule of Evidence 615, "[a]t the request of
a party the court shall order witnesses excluded so that
they cannot hear the testimony of other witnesses, and
it may make the order of its own motion." That rule
does not authorize the exclusion of four categories of
persons, including "a person whose presence is shown
by a party to be essential to the presentation of the
party's cause." FED. R. EVID. 615(3). As the party asserting
a Rule 615(3) exception, Olofson bore the burden for
showing that the exception applied. *Opus 3, Ltd. v. Heritage
Park, Inc.*, 91 F.3d 625, 628 (4th Cir. 1996); *United States
v. Jackson*, 60 F.3d 128, 135 (2d Cir. 1995). We review for
an abuse of discretion a district court's decision about
the essentiality of a witness's presence under Rule 615(3).
*Milicevic v. Fletcher Jones Imports, Ltd.*, 402 F.3d 912, 916
(9th Cir. 2005); *Opus 3*, 91 F.3d at 629; *Jackson*, 60 F.3d
at 135-36.

At trial, Olofson presented two reasons for opposing the
government's request to exclude Savage from the court-
room. First, he argued that because Federal Rule of Evi-
dence 703 permits an expert to base his opinion upon facts

or data made known to him at trial, Savage "should be allowed to be present to hear" the government expert's testimony. However, merely because Rule 703 contemplates that an expert may render an opinion based on facts or data made known at trial does not necessarily mean that an expert witness is exempt from a Rule 615 sequestration order. The text of Rule 615 plainly does not provide for such a per se exception; rather, Rule 615(3) confers discretion upon district courts to determine whether a given witness (of whatever stripe) is essential. We agree with the courts of appeals that have addressed the issue that Rule 703 is not an automatic exemption for expert witnesses from Rule 615 sequestration. *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1374 (5th Cir. 1981); *Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 630 (6th Cir. 1978); *see Opus 3*, 91 F.3d at 629. Therefore, the mere mention of Rule 703 by Olofson was insufficient to show that a Rule 615(3) exception was warranted.

Second, Olofson stated that he "would like to have Mr. Savage present to hear" the government expert's testimony on malfunctions so that he could "rebut or add information" if such testimony was incomplete or incorrect. While no precise incantation is required, we doubt whether those statements advanced the argument that Savage's presence was essential under Rule 615(3). Olofson did not tell the district court (as he tells us on appeal) that Savage's presence was of critical import to his highly-technical defense that the AR-15 malfunctioned. Even assuming that he did make the argument, Olofson did not carry his burden of demonstrating essentiality. The defendant stated that Savage should be allowed to hear the

government expert's testimony so that Savage could "rebut or add information" to any inaccurate testimony about malfunctions, but Olofson did not tell the district court why Savage's presence was necessary to achieve that end. Indeed, much of the data and malfunction information relied upon by the government's expert was already known to Savage due to the pre-trial disclosure of the government expert's reports, and Savage had the opportunity to respond to such materials during the defendant's case. Regarding any information which was not included in the reports but may have come into evidence during the testimony of the government's expert, Olofson had ample opportunity on direct examination for Savage to rebut, add to, or opine on the implications of such information by asking him to assume its existence.

Although it might have been helpful or desirable for Savage to hear the government expert's testimony, Olofson did not show that Savage's presence was *essential* to the presentation of his case. Therefore, the district court did not abuse its discretion in denying Savage a sequestration exemption under Rule 615(3).

### E.  Denial of Olofson's Discovery Requests

Prior to trial and pursuant to *Brady*, Olofson made a motion to compel the discovery of evidence he had requested but that the government had not produced. The defendant sought: 1) documentation of the procedures used by the ATF in testing the AR-15; 2) correspondence between the ATF and the manufacturer of the defendant's

AR-15 concerning the use of M-16 parts in early AR-15 rifles; 3) information about changes in the ATF's registry of AR-15 rifles with M-16 components; and 4) documents pertaining to the ATF's refusal to register AR-15 rifles with M-16 parts. The district court denied the defendant's motion on the first day of trial after concluding that the information sought was not exculpatory. On appeal, Olofson claims that the district court committed prejudicial error in denying his *Brady* motion and that he therefore is entitled to a new trial. We review a district court's decision that evidence need not be produced under *Brady* for an abuse of discretion. *United States v. Dabney*, 498 F.3d 455, 459 (7th Cir. 2007).

Under *Brady*, the government is constrained to disclose evidence that is favorable to a defendant and material to either his guilt or punishment. *United States v. Fallon*, 348 F.3d 248, 251 (7th Cir. 2003). Favorable evidence includes both impeachment and exculpatory evidence. *United States v. Baker*, 453 F.3d 419, 422 (7th Cir. 2006). Even when the government has not disclosed such evidence, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "We have described this inquiry as 'materiality,' and stated that the demonstration of materiality is the key to obtaining a new trial where a defendant alleges a *Brady* violation." *Baker*, 453 F.3d at 422. Thus there are three parts to a *Brady* violation: 1) the disputed evidence must be favorable to the defendant, either because it is exculpatory or im-

peaching; 2) that evidence must have been suppressed by the government, either willfully or inadvertently; and 3) prejudice must have occurred. *Strickler*, 527 U.S. at 281-82.

Regarding the first non-disclosed item—the ATF's internal procedures for test-firing AR-15 rifles—Olofson says he wanted that information because "[f]ailure to follow those procedures by changing the type of ammunition in the second test could demonstrate that the tests had been manipulated to arrive at a reversal of the results of the first test." We do not see how that information could have exculpated Olofson; section 5845(b) does not require compliance with ATF test-fire procedures in order for a weapon to qualify as a machinegun, nor must the weapon fire any particular grade of ammunition or in the prohibited fashion during the first test-fire. Assuming that such evidence might have had some impeachment value, there was no *Brady* violation because the government's expert was otherwise sufficiently impeached. *United States v. Ervin*, 540 F.3d 623, 632 (7th Cir. 2008) ("*Brady* does not extend to 'evidence that impeaches an already thoroughly impeached witness.'" (quoting *United States v. Kozinski*, 16 F.3d 795, 819 (7th Cir. 1994))). Specifically, Olofson questioned the government's expert at length about ATF test-fire procedures and the types of ammunition used in the tests. In addition, the government's expert admitted that the gun fired automatically more than one round with a single function of the trigger without manual reloading in the second test with civilian-grade rounds, but jammed in the first test with military-grade rounds. Even if the second test was inconsistent with ATF procedures, that fact would not undermine

confidence in the outcome of the trial. *Kyles v. Whitney*, 514 U.S. 419, 434 (1995). Therefore, the district court did not abuse its discretion in denying the defendant's motion to compel the production of that evidence.

With respect to his request for the ATF's correspondence with the manufacturer of his AR-15 concerning the use of M-16 parts in early AR-15 rifles, the defendant contends that evidence was exculpatory because it was relevant to his knowledge of whether or not his AR-15 was a machinegun. The district court denied Olofson's request on the first day of trial. At the sentencing hearing, the court revisited the issue; the court inspected a document *in camera*, stated that it was not exculpatory, and placed it under seal. We subsequently ordered that document to be unsealed. That evidence is a 1983 letter from the ATF to the manufacturer of the AR-15 in which the ATF advised the company that the installation of certain M-16 parts in AR-15 receivers may permit the weapon to fire automatically even though an automatic sear is not present. We agree with the district court that the document is not exculpatory: it has no bearing on Olofson's knowledge of whether his AR-15 was a machinegun.[8] The

---

[8] The government's theory of the case was that the AR-15 *functioned* as a machinegun, thus implicating the first sentence of § 5845(b)'s definition of the term. As discussed earlier, the district court instructed the jury using only that part of § 5845(b), and sufficient evidence of Olofson's knowledge of the AR-15's firing capacity was presented to convict him. Had the government attempted to prove that a part or combination

(continued...)

letter has no impeachment value either. Therefore, the district court did not abuse its discretion in refusing to order the production of that evidence.

Lastly, Olofson argues that any documents relating to the ATF's change in registry or refusal to register AR-15 rifles with M-16 components were exculpatory because they could have been used to refute the government expert's testimony that the M-16 parts in Olofson's AR-15 made it a machinegun. But the government's expert did not testify that the AR-15 was a machinegun merely because it had M-16 parts; rather, the expert stated that the AR-15 *fired* the way it did due in part to the M-16 components. Regardless, like the district court, we do not see how the ATF's opinions or positions regarding the presence of M-16 parts in AR-15 rifles are the least bit germane to Olofson's conviction for knowingly transferring a machinegun. The district court did not abuse its discretion in denying Olofson's motion to compel the government to produce that evidence.

## III. Conclusion

In sum, the defendant's proffered jury instruction was not a correct statement of the law, and the district court

---

[8] (...continued)

of parts in the AR-15 made it a machinegun under the second sentence of § 5845(b), then perhaps evidence about the manufacturer's installation of M-16 parts in AR-15s would have been relevant to the defendant's knowledge of those parts in the weapon.

properly rejected it. Furthermore, the evidence presented at trial was sufficient to sustain Olofson's conviction, and 18 U.S.C. §§ 922(*o*) and 924(a)(2) are not unconstitutionally vague as applied to the facts of this case. In addition, the district court did not abuse its discretion in either excluding the defendant's firearms expert from the courtroom during the government expert's testimony or in denying Olofson's motion to compel the production of evidence he had requested from the government. Accordingly, we AFFIRM Olofson's conviction.