NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2063
_____

UNITED STATES OF AMERICA

v.

BRIAN S. KUDALIS,

Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-08-cr-00391-001
District Judge: The Honorable Gary L. Lancaster


Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
May 10, 2011

Before: SMITH, CHAGARES, and VANASKIE, *Circuit Judges*

(Filed: May 26, 2011)


_____

OPINION
_____

SMITH, *Circuit Judge.*

A jury convicted Brian Kudalis of knowingly transferring and possessing a device

designed and intended to convert a gun into a fully-automatic firearm, *i.e.*, a machine

gun. *See* 18 U.S.C. §§ 922(o)(1), 924(a)(2). The District Court sentenced Kudalis to 33 months in prison, a sentence falling at the low end of the guidelines range. Kudalis appeals his conviction and sentence. We detect no error and will affirm.

I

In May 2008, Kudalis placed an advertisement on the internet in which he claimed that he could convert semi-automatic firearms into machine guns. Undercover state troopers William Ray and Eric Ager got wind of the advertisement and called the telephone number listed in it. The troopers posed as members of an underground militia who were looking to enhance their firepower. Kudalis agreed to meet the troopers.

On May 15, 2008, the troopers met Kudalis at a strip club, and the men had a few drinks. During the meeting, Kudalis asked whether the troopers owned any AR-15 semi-automatic rifles. Ray replied that he was planning on getting one. Kudalis boasted that he could convert it into a machine gun "real easily." He described the two-part device that he would make to convert the gun and explained that the gun would fire between 850 and 900 rounds per minute when he was finished.[1]

After obtaining an AR-15, Ray contacted Kudalis about converting it into a machine gun. Kudalis asked that he furnish him with the gun's lower receiver and bolt carrier, which he would need in order to manufacture and install the conversion device. He also made clear that Ray needed an "old-style" bolt carrier and that the new models

---

[1] Devices used to convert semi-automatic firearms into machine guns are referred to as "lightning links" in law-enforcement parlance. A lightning link works by taking the disconnector (*i.e.*, the part of a semi-automatic firearm that interrupts the cycle of fire) out of the picture.

would not work.

On May 25, 2008, Ray delivered the lower receiver and bolt carrier of an AR-15. Kudalis glanced at the bolt carrier and noticed that it was the wrong kind—it was a new model, and an old model was needed, he told Ray. Kudalis nonetheless decided that he would start manufacturing the conversion device with just the lower receiver. Ray paid $75 up front.

A few days later, Ray purchased an old-style bolt carrier and took it to Kudalis, who by then had installed a homemade conversion device into the lower receiver of Ray's AR-15. Ray paid the $55 balance that he owed Kudalis, and Kudalis—after wiping his fingerprints off of the firearm—returned it to Ray. The men then parted ways.

Ray handed the firearm over to the FBI, which by then had become involved in the investigation. The FBI in turn gave the gun to the Bureau of Alcohol, Tobacco, and Firearms (ATF) for testing. ATF agents examined the lower receiver and identified the conversion device that Kudalis had installed. They decided to test the device. The upper receiver to Ray's AR-15 did not fit over the conversion device, though, so the agents retrieved a spare AR-15 from ATF's storage room, installed the device into it, and conducted a test fire. The gun jammed. Upon disassembling the gun, the agents discovered that a small portion of one piece of the device had snapped off. After consulting with the FBI and the Assistant United States Attorney assigned to the case, the agents placed the device into an evidence bag and stored it. At some point, the piece that had snapped off was lost.

Kudalis was arrested in November 2008. After being Mirandized, he agreed to

3

speak with federal agents. During the interview he admitted that he had made conversion devices for others years before and, after some prodding, that he had made a conversion device earlier that year for a militia member (who we know as Ray). He admitted that he had made the device in order to convert Ray's semi-automatic firearm into a machine gun. He even drew a diagram of the device, explaining that he had learned how to make it from a magazine for firearms enthusiasts.

Kudalis was charged with knowingly transferring and possessing a "machine gun," in violation of 18 U.S.C. §§ 922(o)(1), 924(a)(2). "Machine gun" is defined to include not just the types of automatic firearms identified with Rambo and 1920s gangsters, but also "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into" an automatic firearm. 18 U.S.C. § 921(a)(23); 26 U.S.C. § 5845(b). *See also United States v. Palmieri*, 21 F.3d 1265, 1271–72 (3d Cir.) (discussing the definition of the term "machine gun"), *vacated and remanded on other grounds*, 513 U.S. 957 (1994). Kudalis pleaded not guilty and proceeded to trial. A jury convicted Kudalis, and the District Court sentenced him to 33 months in prison, a sentence falling at the bottom of the applicable guidelines range.

## II

Kudalis raises several issues on appeal.[2] *First*, he says that the evidence is insufficient to support the verdict, because the device he manufactured did not

---

[2] The District Court exercised jurisdiction under 18 U.S.C. § 3231. We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

successfully convert a firearm into a machine gun. This argument lacks a footing in the text of the governing statutes. The statutes do not contain an operability element. *See, e.g.*, *United States v. McGiffen*, 267 F.3d 581, 590–91 (7th Cir. 2001) (collecting cases). The statutes require only that a device have been *designed and intended* to convert a weapon into a machine gun. 18 U.S.C. § 921(a)(23); 26 U.S.C. § 5845(b).[3] Here, the jury reasonably found that the device that Kudalis transferred and possessed had been designed and intended to convert Ray's AR-15 into a machine gun.

*Second*, Kudalis argues that the admission of certain expert testimony ran afoul of Federal Rule of Evidence 704(b). The Rule provides:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed. R. Evid. 704(b). The Rule prevents "an expert witness from testifying that a defendant did or did not possess the requisite mental intent at the time of the crime." *United States v. Orr*, 68 F.3d 1247, 1252 (10th Cir. 1995); *see also United States v. Watson*, 260 F.3d 301, 309 (3d Cir. 2001) (observing that Rule 704(b) prohibits expert opinion on whether "'the defendant did or did not possess the requisite mens rea'") (citations omitted).

Kudalis does not claim that an expert testified that he *knowingly* transferred or

---

[3] This is not to say that operability is irrelevant. Whether a thing performs a given function is germane to determining whether it was designed and intended to so perform. But it is possible for a thing to have been designed and intended to perform a given function even if it does not in

5

possessed the conversion device. He claims, instead, that the District Court violated Rule 704(b) by admitting expert testimony that the device had been designed and intended to convert a weapon into a machine gun. We are not persuaded that such testimony falls within the ambit of the Rule. Such testimony goes not to whether Kudalis had the requisite mens rea at the time of the transfer or possession, but to whether the device fit the definition of "machine gun" set forth in 26 U.S.C. § 5845(b). As the Seventh Circuit has recognized (albeit in a slightly different context), "§ 5845(b) has nothing to do with defining culpable mental states. Its sole purpose is to define things." *United States v. Syverson*, 90 F.3d 227, 230–31 (7th Cir. 1996).

*Third*, Kudalis contends that the District Court erred in admitting the homemade conversion device. He reasons that a portion of the device snapped off during ATF testing and that admitting it therefore violated the rule that "an object connected with a crime must be shown to be in substantially the same condition as when the crime was committed before it can be admitted." *United States v. Clark*, 425 F.2d 827, 833 (3d Cir. 1970) (citing *United States v. S.B. Penick & Co.*, 136 F.2d 413, 415 (2d Cir. 1943)); *see also United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981) (physical evidence is admissible as long as "there is a reasonable probability that the evidence has not been altered in any material respect since the time of the crime") (citations and internal quotation marks omitted). We reject Kudalis' argument. We have examined the record on this point, including images of the device, and agree with the District Court that the

---

fact perform the function. That the *Titanic* sunk does not change the fact that it was designed and intended to be unsinkable. *See* Gov't Br. at 24.

breakage did not significantly alter the device. Moreover, Kudalis has failed to explain how it impeded his ability to mount a defense.

*Fourth*, Kudalis asserts that it was error for the District Court to refuse to give two instructions that he had requested. We conclude that the District Court acted well within its discretion in refusing to give the requested instructions. One of the proposed instructions would have "clarified" a point that the District Court reasonably determined did not need clarifying. *See Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 572–73 (3d Cir. 2002) (affirming district court's refusal to issue a clarifying instruction). The other instruction was, as Kudalis acknowledged before the District Court, more of a closing argument than a jury instruction.

*Fifth*, and finally, Kudalis argues that his 33-month sentence is unreasonable. Kudalis requested a 15-month sentence, which was well below the low end of the guidelines range, on the ground that the device he manufactured did not successfully convert a weapon into a machine gun. He says his sentence is unreasonable because the District Court did not adequately address his request for a 15-month sentence at the sentencing hearing. It is true that the District Judge did not spend much time discussing Kudalis' request. But he was not required to. Our sentencing jurisprudence contains no "lengthy explanation" requirement, especially where, as here, the sentencing argument is legally weak. *See United States v. Tomko*, 562 F.3d 558, 568–69 (3d Cir. 2009) (en banc). The District Judge correctly calculated the guidelines range, stated on the record that he had considered but was rejecting Kudalis' requested sentence, extensively discussed the § 3553(a) factors, and imposed a bottom-of-the-guidelines sentence. The

7

sentence was both procedurally and substantively reasonable.  It will not be disturbed.

## III

For these reasons, we will affirm the District Court's judgment.