In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-3964, 07-4060 & 08-1141

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SAUL GARCIA, DUSTIN DECKER,
and PAULA ALVAREZ,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 07 CR 0012—**John Daniel Tinder**, *Judge.*

ARGUED FEBRUARY 26, 2009—DECIDED SEPTEMBER 1, 2009

Before BAUER, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Paula Alvarez, Dustin Decker, and Saul Garcia were part of a widespread drug conspiracy that stretched from Chicago to Indianapolis. On June 20, 2007, a grand jury returned a four-count second superseding indictment charging twenty-one individuals with a variety of crimes, including conspiracy to distribute in excess of 500 grams of methamphetamine.

*See* 21 U.S.C. §§ 841(a)(1), 846. A jury found both Alvarez and Garcia guilty of participating in the conspiracy; Decker pled guilty. We consolidated the defendants' cases for appeal.

Because the defendants each played a different role in the conspiracy, we will analyze their arguments separately. Alvarez's arguments represent the bulk of this appeal, and she challenges both her conviction and her sentence; Decker challenges only his sentence; and Garcia's counsel filed an *Anders* brief in support of a motion to withdraw. In the end, we find no error below and affirm Alvarez's conviction and the sentences of both Alvarez and Decker. We also grant Garcia's counsel's motion to withdraw, and we dismiss Garcia's appeal.

## I. ANALYSIS OF PAULA ALVAREZ'S APPEAL

Paula Alvarez is a forty-four-year-old woman who lived just outside of Chicago in Whiting, Indiana. In late 2006, Alvarez, upset over the recent separation from her husband, Efrain, turned for support to two of Efrain's friends: Jorge Baltista[1] and his wife, Hilda Hernandez. Baltista and Hernandez had recently moved from Chicago to Indianapolis, and Baltista suggested that Alvarez visit their family. Alvarez agreed and made the three-hour drive on December 26, 2006.

---

[1] "Jorge Baltista" was an alias for Alvarez's co-conspirator Eloy Hernandez. Both Alvarez and the government refer to this person as Baltista, and we will do the same.

Lo and behold, Baltista was a methamphetamine distributor and had plans for Alvarez apart from assisting her emotional recovery. Witnesses testified that in the three weeks following her first visit to Indianapolis, Alvarez transported drug proceeds and/or methamphetamine on at least three occasions. Alvarez professed ignorance of Baltista's activities and now suggests that she was a vulnerable, desperate victim of manipulation.

At trial, the government presented numerous witnesses to narrate a series of events that transpired between late 2006 and mid-January 2007. Within a month after moving to Indianapolis during summer 2006, Baltista began supplying a man named Eden Soto with around five pounds of methamphetamine approximately twice per week. Soto then distributed the drugs to local dealers, many of whom were also defendants in this case. Baltista's methamphetamine source was a man from Whiting named Luis Javier Villa-Alvarado, known to conspirators as "Lupillo." Lupillo fronted the drugs to Baltista, expecting to be repaid from their resale, and Baltista and other individuals transported the drugs and proceeds to and from Whiting.

Alvarez entered the scene when she first arrived in Indianapolis on December 26, 2006. Baltista testified that he informed Alvarez soon thereafter that he was a drug dealer. Hernandez testified that she and Alvarez discussed Baltista's drug business around this time as well. Within days, Alvarez began helping Baltista transport drug proceeds to Whiting, although she claims that she did so unknowingly. The evidence revealed three events that formed the basis of Alvarez's conviction.

On December 28, just two days after arriving at Baltista's apartment, Alvarez agreed to travel back to Whiting. Baltista testified that he gave Alvarez approximately $45,000 in a box wrapped like a Christmas gift. He claimed that Alvarez knew the package contained money for drugs, but she did not know what type. Hernandez testified that Alvarez saw the cash before the box was wrapped and agreed to transport it, although she recalled the sum to be only $20,000. Alvarez told Hernandez that she was unafraid of getting caught because women are less suspicious than men and less likely to be pulled over by police.

At trial, the government introduced recorded telephone conversations between Baltista and Lupillo related to Alvarez's December 28 trip. Baltista told Lupillo on December 26 that he would send money with Alvarez. The next day, he informed Lupillo that she had not yet left. Lupillo stressed that the payment was urgent, and Baltista agreed to send Alvarez the following day. Alvarez made the trip as planned.

Alvarez's next delivery occurred approximately two weeks later, this time accompanied by Hernandez. On January 10, 2007, Hernandez told Baltista over the telephone that she had just counted $19,460 in drug proceeds. Later that day, Hernandez watched Baltista give this money to Alvarez, who placed it in a clothes bag in her trunk, with instructions to take it to Lupillo. The two women drove to Lupillo's house in Whiting on January 11, where Alvarez hand-delivered the money to Lupillo's girlfriend. Lupillo returned home while the three women

were there and asked his girlfriend if Alvarez had delivered the money. Satisfied, Lupillo left. Alvarez drove Hernandez to Chicago to meet with her probation officer before they returned to Indianapolis.

The day after their return, Hernandez learned from Baltista that authorities had arrested Baltista's main courier, a man nicknamed "Angel."[2] Hernandez told Alvarez that someone had been arrested while going to pick up drugs at Lupillo's house, and Hernandez was scared to remain in the Indianapolis apartment. Alvarez took Hernandez and her two children back to Whiting for three or four days, after which both women again returned to Indianapolis.

Alvarez made her final trip on January 18. That morning, Baltista, knowing that Alvarez was planning to return home, asked her for a ride to Chicago. Baltista testified that he told Alvarez that the purpose of the trip was to pick up drugs, although he did not say what kind. Their first stop was a restaurant in Indianapolis, where they met Eden Soto, his wife Kristi, and a man nicknamed "Enano."[3] Alvarez claims that she waited in her car while the group met inside.

Baltista returned to Alvarez's car and falsely introduced Enano, whom Alvarez had never met, as his son. Baltista then instructed Alvarez to drive Enano to her home in Whiting and wait there; Alvarez and Enano did as told.

---

[2]  Angel's real name was Luis Alberto-Gonzalez.

[3]  Enano's real name was Jose Hernandez-Perez.

According to Enano, they did not talk much during the drive, but Alvarez told him that if they were pulled over, she would claim to be his mother and say that they were going to Chicago. Baltista and a woman named Ericia Warner left Indianapolis for Chicago in a different vehicle approximately two hours later.

After Alvarez and Enano had waited approximately three hours at her house in Whiting, Baltista called and asked them to meet at a restaurant in Chicago. Alvarez, Enano, Baltista, and Warner had dinner at the restaurant, then traveled in the same two cars to a gas station. Alvarez got out of her parked car, leaving the keys in the ignition. While the foursome walked to a nearby store, Baltista's drug source, Lupillo, drove away in Alvarez's car. The group shopped until Lupillo returned approximately thirty minutes later. According to Enano, Alvarez asked Lupillo where he put the "stuff"—which Enano interpreted to mean drugs—and Lupillo stated that it was in the trunk. Baltista testified that Lupillo later informed him that he had placed methamphetamine in Alvarez's car.

Despite Alvarez's original intention to return home to Whiting after dinner, she took Enano to an apartment in Indianapolis, as Baltista instructed. Once there, Enano removed approximately five pounds of methamphetamine from the trunk and went inside. He testified that he and Eden Soto later divided and distributed the drugs to other members of the conspiracy. Alvarez returned to an apartment where Hernandez was staying and told her that she had just returned from Chicago

and dropped off a man who removed "some kind of drugs" from her trunk. The DEA arrested Alvarez one hour later.

At trial, Alvarez presented a much different story, claiming to be unaware of the surrounding drug conspiracy. She denied ever going to Whiting on December 28. She admitted making the trip to Chicago with Hernandez on January 11, but she denied assisting in any money exchange. The government cross-examined Alvarez about her lack of curiosity regarding the alleged events, particularly her last trip to Chicago. Alvarez acknowledged that she did not question why she was transporting Enano, even though it was Baltista who originally needed a ride. She did not wonder how Baltista was going to get to and from Chicago without her. She did not believe that Enano was Baltista's son, but in the more than six hours that she spent alone with him, she never asked him who he was or why he was going to Chicago. She never inquired about Warner, whom she had never met, nor did she ask why she was directed to the gas station in Chicago. She even stated that she did not think it was unusual to leave her keys in the ignition while a stranger drove away in her car.

A jury, unpersuaded by Alvarez's denials, found her guilty of conspiracy to distribute methamphetamine. The probation office prepared a pre-sentence investigation report (PSR), which stated that Alvarez had neither an aggravating nor mitigating role in the offense but recommended a two-level enhancement for obstructing justice. The PSR established her total offense level at forty and

her criminal history category at I, resulting in a recommended Guidelines range of 292 to 365 months' imprisonment. Alvarez objected to the PSR's calculations.

The district court held a sentencing hearing on January 4, 2008, and found that Alvarez's base offense level was thirty-eight. The court deviated from the PSR after finding that Alvarez played only a minor role in the conspiracy, setting her base offense level at thirty-four.[4] After reducing this level by two for her minor role, the court found that Alvarez committed perjury and imposed a two-level enhancement for obstructing justice. The court thus applied a total offense level of thirty-four and a criminal history category I, resulting in a Guidelines range of 151 to 188 months' imprisonment. The court sentenced her to 168 months in jail. Alvarez filed her notice of appeal on January 7.

A theme permeating Alvarez's challenges is that she was merely an ignorant and unwitting subject who was manipulated by Baltista and his cohorts. She claims to have been unaware that Baltista was trafficking in controlled substances and had no idea that she played a role in the enterprise. Although Alvarez's personal circum-

---

[4] According to § 2D1.1(a)(3) of the United States Sentencing Guidelines Manual (U.S.S.G.), if a defendant receives an adjustment for a mitigating role and her base offense level is thirty-eight, the court is to reduce the base offense level by four levels. The defendant then receives a two-level reduction to her base offense level if she played only a minor role. *See* U.S.S.G. § 3B1.2(b).

stances were unfortunate, we disagree with and ultimately reject her arguments.

*A.  Sufficiency of the Evidence*

Alvarez first claims that the government presented insufficient evidence that she knew she was transporting drugs. She faces an uphill battle. When reviewing a challenge to the sufficiency of the evidence, we examine that evidence in the light most favorable to the government and will uphold the jury's verdict so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004) (quotations omitted); *see also United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008). The defendant's "heavy" burden when challenging a conviction for insufficiency of the evidence is "nearly insurmountable." *Moses*, 513 F.3d at 733 (quotations omitted); *see also United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005) ("Sufficiency of the evidence challenges rarely succeed because we owe great deference to the jury's verdict.").

We must determine, then, whether the record contains evidence from which a jury could have found that Alvarez conspired to distribute narcotics. On this charge, the government was required to prove that Alvarez knowingly and intentionally joined an agreement with at least one other person to distribute a controlled substance. *See* 21 U.S.C. §§ 841(a)(1), 846; *see also United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009). A conspiracy

under § 846 requires "'substantial evidence that the defendant knew of the illegal objective of the conspiracy and agreed to participate.'" *Longstreet*, 567 F.3d at 918-19 (quoting *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008)). But drug type and quantity are not elements of conspiracy; to sustain a conviction, Alvarez need not have known the specific drug as long as she was aware that a controlled substance was involved. *See United States v. Gougis*, 432 F.3d 735, 745 (7th Cir. 2005); *United States v. Carrera*, 259 F.3d 818, 830 (7th Cir. 2001).

Contrary to Alvarez's assertions, the government presented plenty of evidence that she knew of the illegal objective of this conspiracy. Baltista and his wife Hernandez expressly stated that Alvarez knew of Baltista's drug business; both of them had discussed it with her. Hernandez testified that Alvarez hand-delivered cash proceeds to Lupillo's girlfriend and said that she was not afraid to get stopped by police. And then there was Alvarez's final trip to Chicago, which was suspicious to say the least. Baltista testified that he informed her of the trip's singular purpose: to retrieve drugs. Her new passenger, Enano, claimed that she created a cover story in the event that the two of them were pulled over. She left her keys in the ignition while Lupillo took her car, and Hernandez and Enano both testified that Alvarez knew she was returning to Indianapolis with illegal drugs in her trunk. Enano overheard Alvarez ask Lupillo if the "stuff" was in her car, and Alvarez purportedly told Hernandez that she dropped off a man who removed "some kind of drugs." This is more than enough evidence for a jury to conclude that Alvarez was guilty of the charged conspiracy.

In her brief, Alvarez often refers to the evidence as "incredible" or "inconsistent," and she notes that much of the testimony regarding her knowledge of the drugs came exclusively from her co-conspirators. She misapprehends our review on appeal. Our task is not to evaluate the witnesses' credibility or to resolve minor discrepancies; that is exclusively the jury's domain. *See Rollins*, 544 F.3d at 835; *United States v. Pagan*, 196 F.3d 884, 889 (7th Cir. 1999) ("The extent to which [a witness's] personal failings and motivations may have influenced his testimony was for the jury to decide."). Rather, we must simply ensure that the government produced evidence from which a jury could have found Alvarez guilty, and we are satisfied that it did so.

## B. *The District Court's "Ostrich Instruction"*

Alvarez next attacks the district court's "ostrich" or "conscious-avoidance" jury instruction. The so-called "ostrich instruction" informs the jury that a defendant may not bury her head in the sand to actively avoid the truth; the jury may therefore equate a defendant's deliberate avoidance of knowledge with actual knowledge. *United States v. Neville*, 82 F.3d 750, 759 (7th Cir. 1996); *United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986). "The purpose of the [ostrich] instruction 'is to inform the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings.' " *United States v. Craig*, 178 F.3d 891, 896

(7th Cir. 1999) (quoting *United States v. Rodriguez*, 929 F.2d 1224, 1227 (7th Cir. 1991)). Deliberate avoidance is not a lesser standard than actual knowledge; it is simply another way to prove such knowledge. *United States v. Carani*, 492 F.3d 867, 873 (7th Cir. 2007).

Alvarez first challenges the form of the court's instruction, claiming that it was not an accurate statement of the law. Second, she argues that there was no evidentiary basis for issuing the instruction to the jury. Neither argument prevails.

1. *The court's instruction was an accurate statement of the law.*

Alvarez first argues that the instruction was inaccurate because the court did not inform the jury that she must have been aware of a "high probability" that she was trafficking illegal drugs. Although Alvarez argued at trial that the evidence did not support giving the instruction, she did not object to its form, nor did she suggest alternative language. We therefore review for plain error.[5] *See United States v. Linwood*, 142 F.3d 418, 422

_____

[5] Had Alvarez properly objected to the form of the court's instruction, we would conduct *de novo* review. *See United States v. Olofson*, 563 F.3d 652, 656 (7th Cir. 2009) ("Whether jury instructions correctly state the law is a matter we review de novo."). But the standard of review in this case is immaterial; we would uphold the court's instruction under *de novo* review as well.

(7th Cir. 1998) ("[N]ot just any objection will save an issue for review—neither a general objection to the evidence nor a specific objection on a ground other than the one advanced on appeal is enough."). Plain error review is "exceedingly deferential" and targets "particularly egregious errors." *Id.* (quotations omitted). To warrant reversal, the error must affect the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993).

At the close of trial, the court gave the jury the following instruction:

> As to [Alvarez], you are instructed that actual knowledge and deliberate avoidance of knowledge are the same thing. Thus, . . . you may infer knowledge from a combination of suspicion and indifference to the truth. That is, if you find that [she] had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut [her] eyes for fear of what [she] would learn, you may conclude that [she] acted knowingly or with knowledge, as these terms are used in these instructions.

We find no error in the district court's ostrich instruction, which parallels instruction 4.06 of our pattern jury instructions, as well as our seminal opinion authorizing precisely this language. *See Ramsey*, 785 F.2d at 190-91. We have repeatedly approved this instruction as an accurate statement of the law regarding the deliberate avoidance doctrine. *See, e.g., Craig*, 178 F.3d at 896; *Neville*, 82 F.3d at 760; *United States v. Jackson*, 33 F.3d 866, 874 (7th Cir. 1994); *United States v. Paiz*, 905 F.2d 1014, 1022

(7th Cir. 1990), *abrogated on other grounds by Gozlon-Peretz v. United States*, 498 U.S. 395 (1991).

Although Alvarez acknowledges our precedent, she asks us to stray from it, citing cases from the Second and Ninth Circuits suggesting that a proper instruction should inform the jury that the defendant must have been aware of a "high probability" of a fact's existence and deliberately avoided learning of it. *See United States v. Feroz*, 848 F.2d 359, 360 (2d Cir. 1988) (per curiam); *United States v. Valle-Valdez*, 554 F.2d 911, 913-14 (9th Cir. 1977). We decline to mandate such language in an ostrich instruction and find no error by the district court. Perhaps the words "high probability" would further clarify the concept, but the court's instruction here required the jury to find that Alvarez had a "*strong* suspicion" of wrongdoing and "indifference to the *truth*," which, by definition, means ignoring something that one knows or strongly suspects to be true. Alvarez has provided no reason to overturn our precedent approving the use of the district court's version of the ostrich instruction, which accurately informed the jury of the law.

### 2. *The evidence supported issuing the "ostrich instruction."*

Alvarez also asserts that the evidence at trial did not warrant issuing the ostrich instruction. We review this issue for an abuse of discretion and view all evidence in the light most favorable to the government. *United States v. Carrillo*, 435 F.3d 767, 780 (7th Cir. 2006); *Craig*, 178 F.3d at 896.

An ostrich instruction is appropriate where (1) a defendant claims to lack guilty knowledge, i.e., knowledge of her conduct's illegality, and (2) the government presents evidence from which a jury could conclude that the defendant deliberately avoided the truth. *Carrillo*, 435 F.3d at 780; *see also United States v. Inglese*, 282 F.3d 528, 537 (7th Cir. 2002). It is undisputed that Alvarez claimed to lack guilty knowledge, so the issue is whether the government presented sufficient evidence that she remained deliberately ignorant.

Evidence indicating deliberate indifference may consist of " 'overt, physical acts as well as . . . purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will.' " *Inglese*, 282 F.3d at 537 (quoting *Craig*, 178 F.3d at 896). The instruction is warranted if the evidence permits an inference that Alvarez must have forced her suspicions aside and deliberately avoided confirming that she was engaged in criminal activity. *See Carani*, 492 F.3d at 873. On the other hand, we do not infer knowledge from mere negligence; the defendant's avoidance must be active. *See United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990). The instruction is therefore inappropriate if the evidence permits only a "binary choice," i.e., one between actual knowledge or none at all. *Id.* (citing *United States v. Bigelow*, 914 F.2d 966, 971 (7th Cir. 1990)).

We have upheld the use of the ostrich instruction many times where "a defendant transported under suspicious circumstances packages containing drugs and then claimed ignorance of the packages' contents."

*United States v. Wilson*, 134 F.3d 855, 868-69 (7th Cir. 1998) (collecting cases). We have also held that a scenario in which a defendant admits her association with a group but, despite circumstantial evidence to the contrary, denies knowledge of its illegal activity is "a paradigm case for use of the 'ostrich' instruction." *Paiz*, 905 F.2d at 1022.

As discussed above, the record is replete with evidence from which the jury could have concluded that Alvarez remained deliberately ignorant that she was involved in drug trafficking. Most notable are the circumstances surrounding Alvarez's last trip to Chicago. Even accepting Alvarez's version of the events, which we need not do, she willingly drove to a gas station in Chicago, left her keys in the ignition, and watched a man drive away with her car. When he returned thirty minutes later, Alvarez, uncertain of where he went or what he did, obeyed Baltista's instructions and drove the car and a stranger (Enano) back to Indianapolis. She dropped Enano off at an unknown apartment, where he removed a package from her trunk. We cannot think of many circumstances that would sound more suspicious than these; the government's version of events was even more incriminating.

If the jury did not believe that Alvarez actually knew that she transported drug money and controlled substances, it could have inferred from the testimony at trial that she must have consciously and deliberately avoided learning that fact. That is enough to support the instruction, and the district court did not abuse its discretion by issuing it.

*C. Sentencing Challenges*

Finally, Alvarez challenges her sentence. First, she argues that the court should have considered her a minimal, rather than minor, participant in the conspiracy. *See* U.S.S.G. § 3B1.2. Second, she asserts that the district court erred by enhancing her sentence for obstructing justice after finding that she committed perjury. *See id.* § 3C1.1. Third, she lobs a general attack at the district court's analysis of the factors in 18 U.S.C. § 3553(a) and the reasonableness of her sentence. Each argument fails.

*1. Role in the Offense Reduction*

At sentencing, the district court found that Alvarez was a minor participant in the charged conspiracy and granted her a two-level reduction. *See* U.S.S.G. § 3B1.2(b). Alvarez argues that she was only a minimal participant and should have received a four-level reduction. *See id.* § 3B1.2(a). We review the district court's finding of fact on this issue for clear error. *United States v. Gonzalez*, 534 F.3d 613, 616 (7th Cir. 2008). We rarely reverse a court's denial of a defendant's request for a reduction based on her limited role in the offense, *United States v. Mendoza*, 457 F.3d 726, 729 (7th Cir. 2006), and we will do so only when we are "left with a definite and firm conviction that a mistake has been committed," *Gonzalez*, 534 F.3d at 616 (quotations omitted).

A defendant must demonstrate by a preponderance of the evidence that she is entitled to a minimal or minor participant adjustment under U.S.S.G. § 3B1.2. *United*

*States v. McKee*, 389 F.3d 697, 700 (7th Cir. 2004). The Sentencing Guidelines define a "minimal" participant as one who is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 cmt. n.4. One sign of a minimal participant is a "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others." *Id.* The Sentencing Commission expressly stated its intent "that the downward adjustment for a minimal participant will be used infrequently." *Id.* A "minor" participant, on the other hand, is one "who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* § 3B1.2 cmt. n.5.

The district court did not err by considering Alvarez to be a minor participant. A defendant who was an essential part of a conspiracy does not merit a role reduction simply because other members of the conspiracy were more involved. *United States v. Gallardo*, 497 F.3d 727, 741 (7th Cir. 2007). We have previously held that even a *minor* role reduction need not apply to a defendant who was close to the leaders of a conspiracy and handled or transported drugs. *See, e.g.*, *United States v. Bautista*, 532 F.3d 667, 674 (7th Cir. 2008) (affirming denial of reduced role for a primarily silent compatriot of the conspiracy's leaders who once transported a pound of methamphetamine); *Gallardo*, 497 F.3d at 741 (noting that defendant "handled large quantities of cash and drugs [and] executed essential deliveries"); *Mendoza*, 457 F.3d at 729-30 (affirming denial of a minor role reduction based upon defendant's close relationship with the leader and role as a drug courier); *United States v. Rodriguez-Cardenas*, 362 F.3d 958,

960 (7th Cir. 2004) (finding no clear error in denying a minor role reduction for a defendant who delivered drugs on two occasions); *United States v. Osborne*, 931 F.2d 1139, 1157-59 (7th Cir. 1991) (discussing the importance of drug couriers, particularly those willing to undertake illegal transit while remaining "studiously ignorant" (quotations omitted)).

This brief review of our jurisprudence suggests that Alvarez was fortunate to receive any role reduction at all. As we have mentioned several times now, witnesses testified that she substantially assisted the conspiracy's drug trafficking activity. She was close to the drug network's leaders, who trusted her to transport drugs and money on multiple occasions. The district court expressly stated that Alvarez was "less culpable than most of the other participants; but her role, given the number of trips that she made and the trust . . . which was placed in her, I cannot find that she is a minimal participant; but she is a minor participant." We can find no clear error in this determination.

### 2. *Obstruction of Justice Enhancement*

Alvarez next argues that the district court erred in imposing a two-level increase to her offense level for obstructing justice. *See* U.S.S.G. § 3C1.1. In making its finding that Alvarez obstructed justice, the district court stated:

> Now, with respect to the question of obstruction of justice, it is beyond genuine dispute that her

testimony was blatantly false during trial, directly contradicted by other credible witnesses who testified before the jury as well as the information contained on the wiretaps with respect to the different calls related to the trips that she took; and her testimony was just simply incredible as I observed it here in the courtroom, and her response to the questions on cross-examination revealed the false nature of it.

As such, I would find that it was an obstruction of justice and an attempt to deceive the jury and mislead the jury as to this Defendant's role in the activities; and so a 2-level upward adjustment is appropriate . . . .

Alvarez's only argument against the enhancement is that the district court "failed to provide any specific reason or identify the subject matter of the testimony the court found offensive."

Perjury can be an appropriate basis for an obstruction enhancement under § 3C1.1, *United States v. Ellis*, 548 F.3d 539, 545 (7th Cir. 2008), but the district court must not punish the defendant solely for exercising her right to testify, *see* U.S.S.G. § 3C1.1 cmt. n.2; *see also United States v. Dunnigan*, 507 U.S. 87, 96-97 (1993). The obstruction enhancement applies only "if a defendant 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Turner*, 203 F.3d 1010, 1020 (7th Cir. 2000) (quoting *Dunnigan*, 507 U.S. at 94); *see also* U.S.S.G. § 3C1.1

cmt. n.2. We review *de novo* whether the district court made the findings of fact necessary to support an enhancement; so long as it made such findings, we review the court's underlying determination that perjury actually occurred for clear error. *Ellis*, 548 F.3d at 544-45.

Here, the district court made clear that it found all of the elements of perjury to support an enhancement under § 3C1.1: falsity, willfulness, and materiality. *See Ellis*, 548 F.3d at 545; *Turner*, 203 F.3d at 1020. Alvarez argues that the court did not specifically identify her false statements, but we have previously held that "[w]e will not find that the enhancement was unsupported simply because the district court did not cite a specific part of the record in its oral ruling." *Ellis*, 548 F.3d at 546. Even so, the district court in this case referred to "the trips that she took," related wiretap evidence, and Alvarez's "role in the activities." The evidence against Alvarez was almost exclusively related to these trips, and the district court did not err by applying the obstruction enhancement.

### 3. *Reasonableness of the Sentence*

The remainder of Alvarez's argument simply attacks her sentence's reasonableness and the court's analysis of the factors in 18 U.S.C. § 3553(a). But it is the sentencing court's role to impose a sentence after addressing the appropriate factors, and we review the sentence's reasonableness only for an abuse of discretion. *Gall v. United States*, 128 S. Ct. 586, 597 (2007). We may presume that a sentence within a properly calculated

Guidelines range is reasonable, *United States v. Miranda*, 505 F.3d 785, 791 (7th Cir. 2007) (citing *Rita v. United States*, 551 U.S. 338, 347 (2007)), and that is precisely the case here. The district court properly applied the Guidelines, considered each of the § 3553(a) factors, and sentenced Alvarez to 168 months' imprisonment—well within the range of 151 to 188 months. Nothing overcomes the presumption of reasonableness, and we find no abuse of discretion in the court's sentence.

We reject each of Alvarez's arguments and uphold both her conviction and her sentence.[6] We now turn to Decker's appeal.

## II.  ANALYSIS OF DUSTIN DECKER'S APPEAL

Dustin Decker was a methamphetamine dealer in Indianapolis who purchased some of the drugs that Baltista and Eden Soto obtained from Lupillo. Decker pled guilty to conspiracy to distribute, and possession with intent to distribute, in excess of 500 grams of a

---

[6] Alvarez also claimed in her opening brief that no evidence demonstrated she knew the conspiracy was trafficking in methamphetamine rather than a less serious drug, and that sentencing her accordingly violated her right to due process. But a defendant may be convicted for conspiracy without knowing the precise type of drug involved, *see Carrera*, 259 F.3d at 830, and inherent in a conviction is that a defendant will also be *sentenced*. The jury found Alvarez guilty of conspiring to distribute methamphetamine—there was no evidence of any other drug—and the court did not err in its sentence.

mixture or substance containing a detectible amount of methamphetamine. *See* 21 U.S.C. §§ 841(a)(1), 846.

At Decker's plea hearing, a federal agent testified that authorities recovered two sizeable stashes of methamphetamine from Decker's home. The agent also stated that from approximately October 1, 2006, through January 22, 2007, Decker received weekly deliveries of around five pounds of methamphetamine, which he intended to resell for profit. Decker agreed with the factual basis for his plea, except for the weekly drug quantity. He claimed that he only received seven to eight pounds of methamphetamine during the entire conspiracy.

The probation office prepared a PSR, which adopted the government's factual basis for Decker's plea. The PSR noted but dismissed Decker's claim that he had only distributed seven to eight pounds of methamphetamine and fixed his base offense level at thirty-eight. Decker accepted this base offense level in his Sentencing Memorandum, but he requested that the court grant a reduction based on his minor role. *See* U.S.S.G. § 3B1.2(b).

At his sentencing hearing, the district court adopted the PSR's suggested base offense level of thirty-eight. Decker's counsel did not object to the recommended drug quantity. The only argument Decker presented was that he should receive a reduction for his minor role in the conspiracy. In making this argument to the court, Decker's counsel stated:

> We aren't arguing—and we understand well the
> law in the area with regard to conspiracies and that
> is that he could be tied to the total amount of the

conspiracy. That's not our argument. Actually, we're using that as part of our argument as a minor participant.

After imposing a two-level increase for possession of a firearm and granting a three-level reduction for acceptance of responsibility, the district court set Decker's final offense level at thirty-seven. His criminal history category was II, resulting in a Guidelines range of 235 to 293 months' imprisonment. The district court sentenced Decker to 235 months in prison, and Decker appealed.

Decker claims that the district court miscalculated his base offense level by holding him responsible for too much methamphetamine. Before we may reach the merits of Decker's argument, we must consider whether he waived or merely forfeited his challenge, a distinction carrying great weight. Waiver is the intentional relinquishment of a known right, and it precludes appellate review altogether. *United States v. Jaimes-Jaimes*, 406 F.3d 845, 847 (7th Cir. 2005) (citing *Olano*, 507 U.S. at 733). Forfeiture, on the other hand, is the failure to timely assert a right, and we review a forfeited challenge for plain error. *Id.*

The line between waiver and forfeiture is often blurry. We have noted that "[t]he touchstone of waiver is a knowing and intentional decision" not to assert a right, *id.* at 848, whereas forfeiture typically results from "an accidental or negligent omission," *United States v. Cooper*, 243 F.3d 411, 416 (7th Cir. 2001). The distinction is not always easy to make, and the important concern is

whether a defendant chose, as a matter of strategy, not to present an argument. *See Jaimes-Jaimes*, 406 F.3d at 848; *see also United States v. Allen*, 529 F.3d 390, 395 (7th Cir. 2008).

Decker argues that his counsel's above-quoted comments did not waive his challenge, relying heavily on our remark in *Jaimes-Jaimes* that "a lawyer's statement at sentencing that the defendant does not object to anything in the presentence report does not inevitably constitute a waiver." 406 F.3d at 848. He also claims that *Jaimes-Jaimes* requires that a defendant's intent to relinquish a challenge appear unambiguously in the record.

We do not read *Jaimes-Jaimes* as broadly as Decker suggests. In that case, the court could discern no strategic reason for the defendant's failure to object to a sixteen-level sentencing adjustment. *Id.* In fact, we noted that "the *only* plausible possibility" was that the defendant's attorney was deficient in failing to object, and therefore it was "accidental rather than deliberate." *Id.* (emphasis added) (quotations omitted). Given the magnitude of the adjustment and the absence of a strategic reason for failing to object, we held that the defendant merely forfeited his challenge, even though counsel affirmatively stated that he accepted the Guidelines calculation. *Id.* at 848-49.

Although a lawyer's statement that a defendant has no objection to the PSR does not *automatically* constitute a waiver, it certainly might. *See, e.g.*, *United States v. Staples*, 202 F.3d 992, 995 (7th Cir. 2000); *United States v. Redding*, 104 F.3d 96, 99 (7th Cir. 1996). We must

consider the lawyer's statement in light of the surrounding circumstances and determine whether counsel made a knowing and intentional decision. We do not require the defendant to expressly state on the record his intent to waive a challenge before we will consider it waived—defendants often fail to object to a PSR, and such an express statement is rare. Rather, our task is to use conjecture as to whether the defendant's failure to object was accidental or deliberate, and to do so, we evaluate the record as a whole.

In Decker's case, we find that he waived his objection to the court's drug quantity calculation. His counsel's statement did not merely indicate that he had no objections to the PSR—it affirmatively stated that he knew that Decker could be sentenced for drugs trafficked by the whole conspiracy and that he was not challenging the drug quantity for a strategic reason. This is precisely what the waiver doctrine contemplates.

Moreover, the record, even without reference to counsel's statement, indicates that Decker made a deliberate choice not to challenge the drug quantity calculation. Decker had access to the PSR, knew of his right to object, considered objecting to portions of the PSR other than the one he now challenges, and stated on the record that he did not have any further objections when asked by the district court. We have previously found waiver in similar circumstances. *See, e.g.*, *United States v. Brodie*, 507 F.3d 527, 531 (7th Cir. 2007); *United States v. Martinez-Jimenez*, 294 F.3d 921, 923 (7th Cir. 2002); *Staples*, 202 F.3d at 995; *Redding*, 104 F.3d at 99.

Decker instead focused on his allegedly minor role in the conspiracy, arguing that the amount of methamphetamine that he handled paled in comparison to the quantity attributed to the entire conspiracy. "'There may be sound strategic reasons why a criminal defendant will elect to pursue one sentencing argument while also choosing to forego another, and when the defendant selects as a matter of strategy, he also waives those arguments he decided not to present.'" *United States v. Kindle*, 453 F.3d 438, 442 (7th Cir. 2006) (quoting *Jaimes-Jaimes*, 406 F.3d at 848).

Our duty when considering waiver is to divine from the record an intent to forego an argument, and counsel's statement, in light of the other circumstances in this case, provides more than a sufficient basis for doing so. We find that Decker waived his challenge to the district court's drug quantity calculation.

## III. SAUL GARCIA—COUNSEL'S MOTION TO WITHDRAW

Garcia was another Indianapolis drug dealer who purchased methamphetamine from Baltista on multiple occasions. Following Garcia's arrest on January 19, 2007, police found a drug ledger showing money owed to Garcia for fronted drugs, as well as cash and two rifles. Co-conspirators also testified regarding Garcia's drug transactions.

On September 18, a jury found Garcia guilty of conspiracy to distribute more than 500 grams of methamphetamine; Garcia also had a prior drug-related felony con-

viction. On December 3, the district court sentenced him to 380 months in prison after finding that he was responsible for fifteen kilograms or more of methamphetamine and enhancing his sentence for possessing a firearm and for obstructing justice. Garcia filed his notice of appeal on December 10.

Garcia's counsel, unable to discern a non-frivolous basis for appeal, moved to withdraw. Counsel supports his motion with a thorough brief filed according to *Anders v. California*, 386 U.S. 738 (1967). Garcia did not respond to his counsel's submission, and we therefore confine our review of the record to the potential issues raised in his counsel's facially adequate brief. *See United States v. Schuh*, 289 F.3d 968, 973 (7th Cir. 2002).

After reviewing the record and counsel's well-written *Anders* brief, we agree that there are no non-frivolous issues for appeal. Counsel first raises the district court's evidentiary rulings regarding two witnesses, but Garcia forfeited his challenges by failing to object at trial, *see United States v. McMath*, 559 F.3d 657, 667 (7th Cir. 2009), and we find no plain error in the court's rulings. Counsel also addresses the sufficiency of the evidence to convict Garcia, but he correctly highlights more than enough evidence from which a reasonable jury could have found Garcia guilty. *See Moses*, 513 F.3d at 733.

Counsel next calls our attention to the denial of Garcia's requests for a new attorney. The court below held ex parte hearings to determine whether the requests should be granted, applied the proper criteria, and did not abuse its discretion in finding that new

counsel was inappropriate. *See United States v. Ryals*, 512 F.3d 416, 419-20 (7th Cir. 2008) (explaining the applicable standard when considering a motion for new counsel); *United States v. Best*, 426 F.3d 937, 947 (7th Cir. 2005) (same).

Finally, counsel notes multiple issues regarding Garcia's sentence. After reviewing each of them, we agree that the district court properly calculated the drug quantity for which Garcia was held responsible and did not err by imposing enhancements for possession of a firearm and obstruction of justice. We agree that there are no non-frivolous issues for appeal, and we grant counsel's motion to withdraw and dismiss Garcia's appeal.

## IV. CONCLUSION

We find no error regarding Alvarez's conviction or sentence, and we AFFIRM them both. Decker waived his challenge to the district court's drug quantity calculation, and we AFFIRM his sentence. Garcia has no non-frivolous issues for appeal, and we therefore GRANT his counsel's motion to withdraw and DISMISS his appeal.