In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3494

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEAN D. YOUNG,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 16-CR-169 — **William C. Griesbach**, *Chief Judge*.

ARGUED SEPTEMBER 21, 2018 — DECIDED NOVEMBER 6, 2018

Before WOOD, *Chief Judge*, and FLAUM and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Defendant-appellant Dean Young pleaded guilty to one count of wire fraud, 18 U.S.C. § 1343, for defrauding the Veterans Administration (VA) regarding the extent of his service-related injuries. The district court sentenced Young to 21 months in prison, in the middle of the Sentencing Guideline range calculated based on the loss amount agreed to by the parties and adopted by the court.

Young appeals his sentence, arguing that the district court committed a "plain error" by using the stipulated loss amount of $201,521.41 to calculate both his guideline range and the amount of restitution. We affirm. Young waived any objection to the loss amount. This was not merely a forfeiture—an inadvertent failure to raise an important issue—but rather an intentional waiver that was part of a broad compromise of potentially disputed sentencing issues. We hope this opinion might help illustrate the difference between waiver and forfeiture.

I.  *Factual and Procedural Background*

A.  *Defendant's Military Service*

Defendant Young enlisted in the United States Army in 1977. During a training exercise the following year, he suffered a back injury when his jeep crashed into an unmarked tank trap. Young later took part in a 1979 parachute training exercise. Many years later, he claimed that he was traumatized when he witnessed a fellow soldier's death in the jump. By early 1981, Young had been honorably discharged from the Army.

Over the following decade, Young worked in various positions manufacturing yachts, packaging goods, and operating a boiler. Starting in 1984, after he denied having any medical or mental health conditions, Young also enlisted in the Wisconsin Army National Guard. He was discharged from the National Guard under "general conditions" in 1989.

B.  *Disability Compensation*

In 1990, Young filed his first claim with the VA for compensation for his back injuries from the jeep accident. Young was awarded a 10% disability rating for his back pain, which

resulted in small monthly payments. Another decade passed before Young sought a new disability assessment from the VA, claiming he was unable to bend over to put on socks or tie shoes, could no longer canoe or hunt, and had to change jobs due to his back pain. In May 2002 the VA increased Young's payments to reflect a 20% disability rating, with an effective date of July 30, 2001.

Within a month, Young petitioned for another increase in disability rating, claiming for the first time a mental health disability: service-related depression as a secondary condition to back pain. The following month Young sought a further compensation increase due to "unemployability." In November 2002, Young filed his first claim asserting that he suffered from Post-Traumatic Stress Disorder (PTSD), due primarily to having witnessed the fatal parachute accident and his jeep accident. The VA concluded that Young should receive a combined 40% disability rating for the back problems and PTSD. Young appealed, and in November 2003, he prevailed. The VA increased his disability rating to 70% for his PTSD and 60% for his back injuries. The VA also granted his request for a finding that he was unemployable. He was assigned a combined 100% compensation rate effective as of June 2002.

Young did not stop there. In 2004 he sought additional VA compensation, primarily in the form of a grant to adapt his house to accommodate his allegedly increasing disability. The VA denied his request, noting that he did not need assistive devices such as a cane, braces, or a wheelchair. In his 2005 appeal of that denial, Young asserted that he in fact did need two canes to assist with walking and that he was using a wheelchair. This appeal was denied, so Young appealed again in

2006, adding to his narrative the claim that he was confined to a wheelchair and depended on his wife's help for all daily activities, such as showering. The VA again increased Young's disability compensation, but remanded the grant request due to inconsistencies between Young's stated needs and the results of the VA's medical examinations. Young appeared in a wheelchair for two later examinations. His adaptive housing grant was awarded in 2008.

Young remained satisfied with his compensation level until 2013, when he requested another increase, as well as "Aid and Attendance benefits" to pay for help with daily activities. Young's letter to the VA represented that he was 100% disabled and that his wife cared for all his daily needs. To support that request, Young had a physical examination at the VA Milwaukee office. He told the doctor that he could not walk beyond a few steps. The examining doctor noted the discrepancy between Young's claimed limitations and the more modest injuries observed in the medical examination. The doctor's suspicions were confirmed. After the appointment, he watched Young walk across the parking lot with a normal gait, fold up the wheelchair, and load it into his van. The doctor promptly reported his concerns to VA investigators.[1]

Investigators quickly obtained video recordings of Young moving around his apartment building without a cane or wheelchair. The apartment manager reported that he had not seen Young use a cane or wheelchair, even during Young's regular walks with his dog. As the investigation progressed

---

[1] Later that day, Young received one of his fraudulently inflated benefit payments via wire transfer, which established the basis for the wire fraud count of conviction.

into 2014, the VA obtained more video recordings of Young walking through stores and a casino, carrying bags of ice and cases of beverages, and jointly unloading a large, wheeled tool box from a pick-up truck—all without a cane or wheelchair.

As the VA gathered this evidence, Young sought even more compensation based on his purported reliance on a wheelchair and canes, including a housing grant to remodel his kitchen to install a bathroom, a ramp, and wheelchair lift. The VA denied the requested housing grant. In 2015, the VA sent Young a "due process letter" notifying him of the investigation and the agency's intention to revoke his benefits. After receiving evidence and holding a hearing, the VA issued a decision in February 2016 that Young's past statements regarding his PTSD and the severity of his back injury were "considered to be fraudulent." As a result, the VA revoked Young's unemployability rating, eliminated his compensation payments for PTSD, and reduced his back injury compensation payments to reflect a 20% disability level, effective July 31, 2001, the date from which the 60% evaluation had previously been assigned.

C. *The Criminal Case*

On October 25, 2016, a federal grand jury indicted Young on five counts of wire fraud alleging that his false claims of PTSD and back injury exaggerations allowed him to obtain improperly more than $400,000 in VA funds. This loss estimate was based on Young's receipt of a total of $457,858.70 in VA benefits between August 2001 and the VA's February 2016 decision that reduced his disability rating from 100% to 20% and terminated his unemployability rating and PTSD-related benefits. If Young had been compensated at the 20% disability

level during that same time period, he would have received only $40,506.41.

Young's attorney promptly sought to obtain Young's Army medical and service records, moving to adjourn the court conference and trial dates. At court status conferences over the next several months, Young's attorney explained that he was reviewing medical records, meeting with the prosecutor, and considering the possibility of an agreed guilty plea. In August 2017, Young agreed to plead guilty to one count of wire fraud. As part of the plea agreement, he did not admit to a loss amount of over $400,000. Instead, the plea agreement stated: "Young agrees that as a result of this fraud scheme involving his back disability that he was overpaid $201,521.41." Young further agreed "that the restitution ordered will include all overpayments made to the defendant by the VA during the entire time period set forth in the indictment," and that "[t]he parties agree that this amount is $201,521.41." At the change-of-plea hearing, the district judge confirmed the $201,521.41 loss and restitution amount with Young and his attorney.

The difference of approximately $200,000 between the charged amount of loss and the amount to which Young admitted in the plea agreement was the product of extensive negotiations. Young himself was actively involved in those negotiations. As described in Young's later sentencing memorandum, discovery had been a "laborious process" of "[f]inding witnesses and obtaining old records," as well as reviewing "thousands of pages of medical records, rating decisions, appeals, supporting materials, and army records, all covering a span of time going back to 1977." In the change-of-plea hearing, the judge sensed some hesitation from Young

and asked him about it. Young's attorney explained that "the way the case began is significantly different in terms of financial numbers than the way it is now," and that he and Young had a "long history [ ] going through all of the discovery materials and, frankly, some contentious discussions … about how we get to where we are and what the proof might be at a trial, and what the likely result could be."

After listening to his attorney's explanation, Young asked whether the judge would "review all of the information that we submitted and the VA submitted and all of that stuff." The judge assured him that "there will be a very comprehensive Presentence Report," he would "read that, and then your attorney and you will have the right to submit other relevant evidence that you think bears on sentencing."

The presentence report explained the compromise over the loss and restitution calculation: the government agreed not to include PTSD-related payments in the loss or restitution amounts, leaving Young responsible for the $201,521.41 in overpayments for his fraudulent exaggerations of his back injury. In his sentencing memorandum, Young provided the clearest explanation of how this key issue was resolved:

> The parties discussed the case at length … and went back and forth regarding the merits and difficulties of a trial for both sides. The government's evidence regarding the extent of the defendant's back injury was strong, particularly audio-visual evidence of the defendant ambulating without a cane or wheelchair after saying he needed either or both to do anything. On the other hand, the defendant's evidence about the in-service parachute accident-related PTSD was

also strong. The problem for both sides was whether (and how) a jury could separate the evidence into two tracks when the fraud charges (wire fraud) are all the same.

Rather than go through a long and complex trial with its associated risks, the parties were able to settle the case by separating the tracks of the case (back injury and PTSD) from each other. The defendant would plead to one count and agree to restitution regarding improper benefits based on any back injury rating over 20%. For the government's part, it would agree to not pursue restitution for the portion of the defendant's benefits attributable to PTSD. Upon consultation, the VA was able to separate the benefits attributable to each claim. Originally, the loss amount for both tracks was set at $417,352.29. With the PTSD benefits subtracted, the remaining loss amount attributed to the back injury portion of the case was $201,521.41. The parties used this figure to calculate the guideline range and the amount of restitution.

Young's attorney reported at the sentencing hearing that "we don't have any objections to the report or the Guideline calculations" because the assigned probation officer had made Young's requested "simple factual changes" and had included "some additional records … [in] the final version of the report." After hearing those assurances, the district court "adopt[ed] the factual statements in the Presentence Report as [its] Findings of Fact and … adopt[ed] the Guideline calculation."

Young's attorney again referred to the compromise's rationale later in the sentencing hearing when he argued for a sentence shorter than that recommended by the government. His attorney said it was difficult to say where Young "specifically crossed that line from a legitimate dispute about an entitlement to an illegitimate one." Thus, he argued, the court's sentence should reflect that "a good enough objective point to tell where [Young's actions] became fraudulent is where the investigation started … in 2013," when the VA doctor detected Young's ongoing fraud. Young's attorney noted that the parties were "really not that far apart" on recommended sentences because they had "spent a great deal of time looking at all of the records … and getting to a point where there was a legitimate place to compromise to avoid a trial." Thus "the parties essentially agree[d] that a sentence should be imposed … [but] just differ[ed] slightly on the length of that [sentence]."

The judge was not persuaded by the argument for additional leniency. He reasoned that a longer sentence was justified by "the need for punishment and the need to deter others," as Young had stolen a "significant amount of money" involving "public funds intended for the injured veterans." Young had perpetrated a "massive and blatant fraud" by "lying about [his] functional ability … for years." The judge observed that "the thing about when somebody lies in such a blatant matter as that [it] calls into question all of the other statements he's made right from the beginning," especially because Young had reported upon entering the National Guard in 1984 "that he had no physical or mental problems." It is hard to disagree with any of those observations. The court imposed a sentence of 21 months, in the middle of the guideline range based on the agreed loss amount of $201,521.41.

The court also ordered restitution in the agreed amount of $201,521.41.

II.  *Analysis*

On appeal, Young does not deny his fraud, but he disputes the calculation of total loss for purposes of the Sentencing Guidelines and restitution. Young argues now that the loss and restitution calculation should be measured from the first time he was awarded any compensation based upon fraudulent claims that he needed assistive devices. Young contends this would result in a total loss and restitution amount of only $126,630.41. The adjustment would also produce a two-level decrease in Young's offense level for the guideline calculation and potentially a lower sentence.

If Young had timely objected to this sentencing issue in the district court, "we would review [the] sentencing court's factual findings … for clear error," *United States v. Newman*, 148 F.3d 871, 876 (7th Cir. 1998) (citation omitted), and its "restitution calculation for abuse of discretion," *United States v. Sunmola*, 887 F.3d 830, 840-41 (7th Cir. 2018) (citation omitted). But Young did not object.

If Young's failure to raise the issue had been inadvertent and thus a forfeiture, we would review the issue for "plain error." See *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1903 (2018); *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016); *United States v. Thomas*, 897 F.3d 807, 817 (7th Cir. 2018). To take advantage of plain-error review, Young would need to meet four criteria: First, the error must not have been intentionally relinquished or abandoned. Second, the error would need to be "plain," meaning clear or obvious rather than subject to fair debate. Third, the error must have affected

Young's substantial rights, meaning there would be a reasonable probability that, but for the error, the outcome of the proceeding would have been different. Fourth, the appellate court's failure to exercise its discretion to correct the forfeited error would seriously affect the fairness, integrity, or public reputation of judicial proceedings. *Rosales-Mireles*, 138 S. Ct. at 1904–05, citing *Molina-Martinez*, 136 S. Ct. at 1343, and *United States v. Olano*, 507 U.S. 725 (1993).

Young's effort to invoke plain-error review fails at the first step. An appellate court need not consider a claimed error if the issue has been waived. "Waiver occurs when a criminal defendant intentionally relinquishes a known right" and should be contrasted with forfeiture, "when a defendant negligently fails to assert a right in a timely fashion." *United States v. Brodie*, 507 F.3d 527, 530 (7th Cir. 2007) (citations and quotation marks omitted). A waiver "extinguishes any error and precludes appellate review." *Id*.

Although "[t]he line between waiver and forfeiture is often blurry," *United States v. Garcia*, 580 F.3d 528, 541 (7th Cir. 2009), this case stands clearly in the realm of waiver. The "touchstone of waiver is a knowing and intentional decision not to assert a right," with a focus on "whether a defendant chose, as a matter of strategy, not to present an argument." *Id*. (citations and quotation marks omitted). If a defendant fails to raise a specific objection at sentencing, "we will view it as having been waived if the defendant had a strategic reason to [forgo] the argument, that is, only if the defendant's counsel would not be deficient for failing to raise the objection." *United States v. Allen*, 529 F.3d 390, 395 (7th Cir. 2008).

As his lawyer emphasized repeatedly in the district court, Young made a strategic decision to stipulate to fraudulent

conduct involving his back injury calculated from the time frame determined by the VA—with the loss and restitution amounts that loss entailed. Defense counsel was far from "deficient for failing to raise [an] objection" to this compromise in the district court. The compromise allowed Young to avoid criminal liability for allegedly fraudulent claims of PTSD and the greater intended loss amounts for which he could be held legally responsible. Young's choice was deliberate, as further confirmed by his lawyer's successful efforts to have the presentence report revised to reflect some factual changes and additional documentation, all without raising any objection to Young's admitted fraud and the agreed loss and restitution amounts. See *United States v. Fuentes*, 858 F.3d 1119, 1121 (7th Cir. 2017) ("objecting to certain parts of a PSR [presentence report], but not the later-challenged Guidelines range constitutes 'the paragon of intentional relinquishment'"), quoting *Brodie*, 507 F.3d at 531.

By "stipulating to the conduct in the plea agreement" and embracing that stipulation in the presentence report, in his sentencing memorandum, and at his sentencing hearing, Young "has waived any claim that he did not engage in that conduct." *United States v. Flores-Sandoval*, 94 F.3d 346, 349 (7th Cir. 1996); see also *Newman*, 148 F.3d at 876, 878 (although defendant objected at sentencing to conduct described in the presentence report and the resulting "amount-of-loss calculation," by "stipulating to the conduct listed in [his] plea agreement, [he] conclusively admitted those facts and waived any subsequent challenge to them").

Young's twenty-year effort to obtain compensation benefits based on injuries he suffered during his four years of service included, we must assume, both valid and fraudulent

claims. As Young observes on appeal, it is "exceedingly diffi-cult … to determine when [he] began his fraudulent scheme [in order] to accurately calculate the actual loss or intended loss as a result of his fraud." But the government and Young agreed on a reasonable line between Young's fabricated and actual injuries. They did so after reviewing thousands of pages and decades' worth of medical records. Their agree-ment was set forth in Young's plea agreement, the presen-tence report, Young's sentencing memorandum, and the sen-tencing hearing. Young "knew he had a right to further judi-cial determinations" on the factual questions of his relevant conduct and resulting loss and restitution amounts, but he "intentionally chose to relinquish that right." He "cannot now resurrect the waived claim" and re-litigate that question on appeal. *Newman*, 148 F.3d at 879.

The judgment of the district court is

AFFIRMED.